Davis, J.,
delivered the opinion of the court.
A member of the House of Representatives seeks in this action to recover salary for the month of November last, which has not been paid him because the money intended for that purpose was embezzled by a subordinate of the Sergeant-at-Arms. The incident which leads to the proceeding in this; court has given rise to debate in the House of Representatives, and has attracted the attention of the country, not only because of the personal financial loss suffered by the people’s Representatives, but also because of the interesting historical and legal questions which have been developed in the endeavor to fix the responsibility for that loss.
Briefly the history of the transaction is this: According to statute and custom, the Sergeant-at-Arms and the Clerk of the Fiftieth Congress continued in the exercise of their duties after the 4th of March last, when that Congress ceased to exist. Members of the House of Representatives receive their salaries upon certificates, signed by the Speaker when the House is in session, by the Clerk during vacation, and it has been a long-continued and consistent custom for the members early in vacation, or shortly before the adjournment, to attach receipts to a number of blank certificates, which are deposited with the Sergeant-at-Arms.
These certificates are printed in blank upon a slip of paper in the following form:
“ No.-.
“ House oe Representatives op the United States,
“ Washington, D. G.,-.
“ I certify that there is due to the Hon.dollars as a member of the House of Representatives for the Fifty-first Congress.

a_v

*220 Below the certificate are printed the words “ Deceived pay-mentbelow these two words the member signs his name, and afterwards the date and amount are filled in, and across the end of the paper, upon its face, outside its margin, and at right angles to the lines thereof, is'inserted the word “salary,” preceded by the name of the appropriate month. This crossing of the certificate is done at the suggestion of the Treasurer’s office and for the convenience of that office.
The Sergeant-at-Arms, towards the end of each month during vacation procures from the Clerk of the House his signature upon the appropriate blank certificate, to which the member has before attached his receipt; he then presents the certificate at the Treasury, receives the amount named therein, deposits it in his safe at the Capitol, credits the amount of the member with the mouth’s salary, and pays it over or retains it as he may be instructed by the member'.
Following this custom plaintiff (who had been a member of the Fiftieth Congress), before leaving Washington last March, sigued in blank nine such receipts, one for each month during the vacation, and received his salary in due course except that for the Congressional month beginning the 4th of November and ending the 4th of December last.
Upon the 27th, 29th, and 30th of November (the 28th being Thanksgiving Day), one Silcott, who was then cashier in the office of the Sergeant-at-Arms, took to the Treasury many members’salary receipts accompanied by certificates filled out for the month of November, and was there given the money necessary to pay the receipted certificates. A large part of this money Sil-cott appropriated to his own use and he is now a fugitive from justice. As a result of this crime plaintiff and other members of the House have not received the salary which is their due.
Tt must be noted that this action relates only to the salary of a member of the House of Kepresentatives for the month of November, 1889. We emphasize this, as it appears that some members had made private deposits with the Sergeant-at-Arms, treating him somewhat as a banker, and some members had not drawn salary for several months, but had allowed it to accumulate in that officer’s hands. Any rights arising from these transactions are not now in issue.
The defaulting cashier, while paid by the Government, was the subordinate of the Sergeant-at-Arms; he was appointed by *221 that officer, was responsible to him, was subject to his orders, and gave bond to him in the sum of $50,000 for the faithful performance of his duties as cashier. It is admitted that in drawing the money from the Treasury the cashier acted for the Sergeant-at-Arms and represented him in fact and in law. There is no complication in this regard, and the responsibility, whatever it may be, is to be ascertained from the relations of the Sergeant-at-Arms, the cashier’s principal, to the House of Bep-resentatives, or to the Members and Delegates individually, or to the Government of the United States.
On one side it is contended that in collecting the money at the Treasury, the Sergeant-at-Arms acted as a public agent, and that, therefore, the loss occasioned by the default of his subordinate shouldf all upon the Government. The defendants urge that the Sergeant-at-Arms, so far as the subject-matter of this action is concerned, was the private agent of the members, authorized by them individually, for convenience, to collect their salaries at the Treasury. This is the main point in the case, the point of most general interest and importance, and its discussion has involved an investigation of the fiscal system of the United States,' a review of the practice which has prevailed since the foundation of the Government, both in the House of Bepresentatives and in the Treasury Department, in relation to the payment of these salaries, and an analysis of the statutes claimed to have a bearing upon-the issue.
A subsidiary argument is advanced by plaintiff in which it is contended that, as his November salary was only due December 4, payment by the Treasury to the Sergeant-at-Arms upon-November 30, or at any time prior thereto, was unauthorized and illegal; and also it is urged that the Olerk can, by statute, certify to salary account during vacation only; the certificate,, therefore, for the November salary, which was in this case signed by the Olerk, was, it is alleged, void and of no- effect, as the salary was not due until after the kd of December, when the House organized and elected a Speaker, who thenceforward, and until the summer recess, alone could certify the members’ salary accounts.
This position is controverted, and the arguments thereon will be considered by us after we have examined the first issue-presented.
When the Sergeant-at-Arms presented to the Treasurer plain *222 tiff’s receipt for November salary, with, the Clerk’s certificate, and received the cash therefor, was he acting as a public agent or as plaintiff’s personal agent %
There is no statute which in express terms makes the Sergeant-at-Arms a disbursing officer of the Government, nor is such a statute necessary. A Government servant may have the powers, duties, and responsibilities of a public agent without express antecedent statutory authority. As a rule, agency to bind the Government is created by statute, but there are many cases decided by this court and the Supreme Court where allegations of contract have been sustained and the Government has been held bound by the acts of an officer performed within the general scope of his duties, but without specific statutory authority for the particular act or class of acts declared upon.
In cases of this nature which have been decided in this court or by the Supreme Court upon appeal there has appeared a user by the Government or a benefit to it. The agent had not specific antecedent authority for his course; but not exceeding the general scope and intent of the authority given him, he took for the Government property of a citizen without disputing the individual ownership; then, as the Government had enjoyed the benefit and advantage of the act of the agent, compensation was allowed the citizen.
This proposition would probably not be controverted, while its application to the present case might be denied. Nor do we assert that our statement is more than illustrative of the principle, which we deem established, that a specific antecedent statutory ‘authority is not necessary to invest a Government officer with power to bind the United States to compensation for loss to an individual benefiting the Government, occasioned by the officer in the rightful performance of his duties.
Executive officers are, properly, most careful to act within specific delegated powers given them by statute or regulation antecedent to action, and we have occasion constantly to see and commend the jealous regard these officers exhibit for the literal commands of statutes and their great care in the protection of the revenue. The line of argument which this habit of thought engenders, while technical, is undoubtedly to be encouraged in all executive officers charged with the disbursement of public funds, and it is perhaps largely due to their *223 «lose construction of statutory grants of power that the fiscal system has been so successfully managed since its establishment in-1789.
The judiciary is, however, compelled to make a more iffiilo-sophical examination of statutory provisions, and must interpret the law, which includes statutes, but is not made up of statutes, in accordance with recognized rules not within the proper jurisdiction of an executive officer to apply.
The Supreme Court lias made this apparent in many cases, among them that of the United States v. McDaniel (7. Pet., 1). In that case it appeared that defendant had been a salaried clerk in the Navy Department, and for some fifteen years had acted as a disbursing officer under the direction of the Secretary of the Navy. For this service he had been paid additional compensation. The Government denied the right to extra compensation, insisting that there was no law authorizing his appointment as a disbursing officer, and that usage, without law or against law, can never lay the foundation of a legal claim.
To this the court answered in substance that it is often necessary for the head of Department to exercise his discretion; he is limited in the exercise of his powers by the law, but it does not follow that he must show a statutory provision for everything he does. Whilst the great outlines of the movements of governmental machinery may be marked out and limitations imposed opon the exercise of power, there are numberless things which must be done that can neither be anticipated nor defined, and which are essential to the proper action of the Government. ‘‘Hence of necessity [say the court] usages have been established in every Department of the Government which have become a common law, and regulate the rights and duties of those who act within their respective limits; and no change of such usage can have a retrospective effect, but must be limited to the future. Usage can not alter the law, but it is evidence of the construction given to it and must be considered binding'on past transactions;” and the court held that, while there was no law authorizing the appointment of defendant as-a disbursing officer, the duties were necessary, they were ordered by the Secretary, the charge for compensation was reasonable, and during fifteen years has been sanctioned by the Treasury, and had not been objected to by the committees of Congress who annually inspected the Department books, and *224 the judgment given below in plaintiff’s favor was affirmed, the court saying, u It would be a novel principle to refuse payment to the subordinates of a Department because a chief, under whose direction they had faithfully Served the public, bad mistaken his own powers and had given an erroneous construction of the law.” (See also United States v. Fillibrown, 7 Pet., 42.)
In Wells v. Nichols (104 U. S., 441), it was decided that while no act of Congres expressly authorized the Secretary of the Interior or other officer of the Land Department to appoiuttim-ber agents, the appropriation by Congress of money to pay them was a recognition of the validity of the appointment.
We may therefore assume that antecedent express statutory authority is not always necessary to invest a Governmentofficer with right to compensation for services rendered or with power to bind the United States for his acts; of course there must be prior authority, or there must be subsequent acts which amount to ratification of what has been done, and we at this point simply find that the authority is not of necessity, antecedent to the agent’s act, nor is it necessarily conferred by the express terms of a statute.
So much weight is attached in this case to the custom which has prevailed in the payment of the salaries of members of the House of Eepresentatives, and that custom is so necessary to an understanding of the statutes which we shall hereafter cite, that some examination of the history of disbursements of this nature becomes important.
Prior to the adoption of the Constitution the finances of the Government were managed by Congress through committees and commissioners, who directed a force of comptrollers and auditors, a treasurer, and the necessary clerks and accountants, all of whom held office imm ediately under the Congress. Demands-upon the Treasury at that time were examined by the legislature, either directly through a submission to the Congress or indirectly through the appropriate committee. After approval in one or the other form the accounts were passed as public accounts and paid by the Treasurer. The whole fiscal administration, whatever its details of management, was in the hands-of. the legislature.
By an act approved September 2,1789, the Treasury Department was established, and thus the fiscal administration under *225 thfe new Government was transferred from the legislature to the Executive. (1 Stat. L., 65.) Twenty days later (sec. 6, act Sept. 22, 1789, 1 Stat. L., 71) it was enacted that the compensation of officers of the House of Eepresentatives should be certified by the Speaker and passed as public accounts and paid out of the public Treasury. This rule was several times re-enacted, and now appears in the Bevised Statutes. The date of this act is important, in view of the subsequent practice under it, and it can not fail to be noted that it was the work of the same Congress which established the Treasury Department, and that it was approved only twenty days after the new fiscal administration had been authorized. In this act provision was made for the compensation of officers of the House, and in section 5 there was allowed “ to the Sergeant-at-Arms, during the session and while employed in the business of the House, $4 per day.”
During this, the first, Congress warrants for members’ salaries were drawn at the Treasury, in favor of the Speaker, and this practice was followed until the Twenty-sixth Congress. In the Twenty-sixth Congress some warrants were drawn in favor of the Speaker, others in favor either of the Treasurer or of certain individual .members or of certain assignees of members.
After the Twenty-sixth Congress, to and including theTbirty-second Congress, all warrants were drawn either in favor of the Speaker or upon his order when in favor of others. As it was impracticable for the Speaker in person to supervise the pay-men-tof members’salaries, he early called to his aid the Sergeant-at-Arms, who performed the clerical and administrative labor incident to this duty.
During the Twenty-fifth. Congress the Committee of Accounts of the House of Eepresentatives was instructed, among other things, to inquire in relation to the subordinate officers of the House, with a view to a definition of their respective duties.
At that time the Sergeant-at-Arms was not recognized in the rules as a disbursing officer, and the duties of that nature imposed upon him he discharged only as an agent of the Speaker. The committee made a report dated March 31, 1838 (Twenty-fifth Congress, second session, H. E. Doc. 750), in which they stated, in substance: That early in the history of the House an unofficial arrangement had been made by the Speaker and the Secretary of the Treasury by which the money appropriated for *226 the pay of members was advanced to the Speaker, who paid the members, taking- their individval receipts, which, with the Speaker’s accounts for the whole transaction, were, at the termination of the session, transmitted to the Treasury Department, there to be passed upon by the accounting officers. This, the committee said, “ was deemed a compliance with the spirit of the law.” Adverting to the “ voluntary and gratuitous” work of the Speaker in this regard, and .of the Sergeant-at-Arms in assisting him, they stated that the practice contributed to public convenience and the dispatch of public business •, it had so long prevailed that there was scarcely a member who did not suppose it a part of the official duty of these officers “not only to settle and audit the accounts of the members, but actually obtain the money and place it in their hands.” The committee commended the practice and recommended its continuance, suggesting only that it receive legislative sanction, as a measure of such “high responsibility and importance” “should not rest alone upon custom or antiquity ” for its sanction or authority. They then reported certain resolutions, which were adopted by the House (April 4, 1838), but which never took the form of a statute.
These resolutions were three in number. The first required the Speaker at the commencement of Congress to designate to the Secretary of the Treasury some suitable depository wherein he should place the money for the compensation of members, “ subject to be drawn out by the check of the Speaker, indorsed by the member of the House entitled to mileage and per diem pay.” The second, as more important, we quote literally:
“ Resolved, That it shall be the duty of the Sergeant-at-Arms to keep the accounts for pay and mileage of the members, to prepare checks for members, and, if required to do so. to draw the money on said checks for the members, the same being previously signed by the Speaker and indorsed by the member in whose favor the same may be drawn, and pay over the same to the member entitled thereto.”
The third resolution directed the Sergeant-at-Arms to give bond “to the United States” conditioned “faithfully to account for the money coming into his hands for the pay of members of the House,” and for his increased duties and liabilities he was allowed extra compensation to be paid out of the .contingent fund of the House.
*227 These resolutions approved a practice already existing and recommended its continuance as contributing to the public convenience and to the dispatch of the public business, and while the committee thought legislative sanction advisable, they apparently were of the opinion that a rule of the House constituted sufficient sanction and an act of Congress was unnecessary.
While the Sergeant-at-Arms was thus directed to keep the accounts of Members, to prepare checks for them, and, if required to do so, to draw .the money on the checks, the Treasury Department continued to advance moneys to the Speaker until the close of the Thirty-second Congress. From the first session of the Thirty-third Congress, beginning December 5, 1853, to the present time warrants to pay the compensation and mileage of the Members have been drawn in favor of the Treasurer of the United States, the moneys advanced have been charged against him on the Treasury books, and the accounts have been settled in the name of the Treasurer. The Treasurer has regularly advanced to the Sergean't-at-Arms the compensation of Members of the House in return for certificates signed, during the session by the Speaker, and during vacation by the Clerk, when accompanied by the Members’ receipts, and, by order of the Secretary of the Treasury, made in 1870, the Treasurer’s' accounts have since that time been balanced afterwards by an “ accountable” warrant issued in the Treasurer’s favor for the gross sum so advanced, instead of by warrants issued from time to time, as was done prior to June, 1870.
It is interesting to note in this connection that, March 12, 1853,,President Pierce issued an order in accordance with the act of January 31, 1823 (3 Stat. L., 723), now section 3648 of the Revised Statutes, directing advances to be made to certain officers called in the act “disbursing officers” of the G-overnment, and at the head of a long list appear, first, “ the Speaker •of the House of Representatives of the United Statessecond, “ the Clerk of said House.” As the Clerk pays the salaries of officers and employés of the House, and controls the contingent fund out of which are paid all expenses of the House, and as he receives no money to pay the salary and mileage of Members, it is evident that the advance of public moneys to the Speaker, contemplated by this order, was to enable him to pay to the Representatives and Delegates their compensation, although *228 the Speaker’s authority in this regard was never conferred by express statute.
Since 1843 the Sergeant-at-Arms has given bond, approved, by the Speaker, to the United States for the faithful disburse rnent of money in his hands, and these bonds have regularly and without objection or comment been received and filed in the Treasury Department. The only public money which comes into the hands of this officer is that intended for the salary and mileage of members; all other money, including that which pays the Sergeant-at-Arms his own saiary and the salaries of his subordinates, is under the control of the Clerk of the House.
The duties of the Sergeant-at-Arms of the House of Representatives of the Fiftieth Congress were prescribed by the fourth rule, and besides those inherent in the office, suchas maintaining order and serving process, we find him directed to “ keep-the accounts for the pay and mileage of members and delegates, and pay them as provided by law. ” This rule differs from the resolution of 1838 (supra) in that the rule directs the Sergeant-at-Arms absolutely to pay the Members and Delegates, whereas the resolution ordered Mm to pay only when “ required to do so. ” This change in phraseology took place in 1880; the rule has since existed in this form and is still in force.
The rule further requires “ the Sergeant-at-Arms to give a bond for the faithful disbursement of all moneys intrusted te him by virtue of his office and the proper discharge of the duties thereof.” It has been shown that the bond given by the Sergeant-at-Arms of the Fiftieth Congress is not drawn in this form, but is conditioned only that he “ shall well and faithfully account for all money coming into his hands for the pay of members of the House of Representatives of the Fiftieth Congress.” As the bona is to the United States and no Government money comes into the Sergeant-at-Arm’s control except that intended to pay the salary and mileage of Members and Delegates, and' as the word “ pay ” may perhaps be held to include mileage as well as salary (although as to this we express no opinion) the difference in phraseology between the bond and the rule may not perhaps be important so far as the Fiftieth Congress was concerned. It will, however, be immediately noticed that the bond is no protection to the Fifty-first Congress.
Still the main fact important to this issue remains that by the rule and by the bond, it appears that the Sergeant at-Arms was- *229 intended and understood by the House to Control the funds necessary to pay Members’ and Delegates’ salary and mileage, and his responsibility for honest administration of moneys coming into his hands for that purpose is pledged, not to the House of llepresentatives, not to the members individually, but to the United States. This bond, like those preceding it, was received and filed at the Treasury without comment or criticism.
Finally we find that the Sergeant-at-Arms is allowed, as ■salaried subordinates, a cashier, a teller, a book-keeper, and a messenger; that he has a large and expensive safe $ that his office is fitted in a manner similar to the arrangement of an •establishment where moneys are received and paid out.
The custom, then, is consistent and long continued. The Congress which created the fiscal system retained the executive control of the Member’s compensation, first leaving it in the Speaker’s hands, who, as the House grew in numbers, •called to his aid the Sergeant-at-Arms, who, later, was ordered by the House to act as its disbursing officer for this one purpose.
The argument thus far shows that while no express statute •conferred upon the Sergeant-at-Arms the duties of a disbursing agent, he is an officer chosen by the House under their constitutional right; that so far as in their power the House has assigned to him the duties of a disbursing officer in regard to one subject, and that for many years he has periormed these duties.
The House of Eepresentatives evidently believed that a rule was sufficient legislative sanction for this course. In this we do not agree. But it is further urged on behalf of plaintiff that even if the rule have not the force contended for, and if there be not sufficient statutory authority to authorize the course hitherto pursued in this regard, plaintiff may invoke the doctrine Communis error faoit fus ; and he cites in support of this contention two cases where it was allowed to override •express statutory provision (Clay v. Sudgrave, 1 Salk, 32; Maher v. The State, 1 Porter, 265).
We do not think there is necessity in this case to examine the doctrine or decide whether it here applies.
Having defined the custom, we turn now to the statutes. They provide that one of the officers of the House shall be a *230 “sergeant-at-arms,” and while the appropriation acts each year recognize the existence of the office, nowhere do we find its duties definitely marked out by statute. The necessary and proper inference is that the duties were to be those prescribed by the House, if consistent with the Constitution and' with law. It is true that where a statute creates an office previously known to the common law, without defining its-powers and duties, it must be assumed that the powers and duties were those legally performed by the officer prior to the statutory recognition (Kirksey v. Bates, 7 Porter 529; Kennedy v. Brunst, 26 Wis. 414); but this doctrine might well be held not to .warrant the inference that these acts recognized as legal the discharge by the Sergeant-at-Arms of the duties of a disbursing officer — duties usually expressly prescribed by a statute even when required by the rules; but there are other provisions in the acts which admit of no sensible interpretation unless the Sergeaut-at-Arms be in fact a disbursing officer. There are provisions for a cashier with a salary of $3,000, a book-keeper with a salary of $1,800, and a paying teller with a salary of $2,000. Unless the Sergeant-at-Arms is to disburse the salaries oí members (and no other public moneys come into his hands) no duties exist for these officers to perform, and their salaries are a useless charge upon the public Treasury. To assume that Congress intended this would be unreasonable, and the natural inference is that these officers were to perform duties of the nature indicated by their titles\ that is, duties of a financial nature in relation to the only public funds in the Sergeant-at-Arms’s hands, those intended to pay members. Neither a payin g teller nor a book-keeper could be of service to an officer required only to maintain order and to serve the process of the House.
The provision for a cashier has particular significance, for it has a definition affixed to it by the Supreme Court (Merchants' Bank v. State Bank, 10 Wall., 604):
“ The cashier is the executive officer through whom the whole financial operations of the bank are conducted. He receives and pays out its moneys, collects and pays its debts, and receives and transfers its commercial securities. Tellers and other subordinate officers may be appointed, but they are under his direction, and are, as it were, the- arms by which designated portions of his various functions are discharged.”
*231 When Congress assigned to the Sergeant-at-Arms a “cashier ” they intended to give to the former the aid cf a financial officer, one who should receive and pay out money coming into his superior’s hands; this money -was that, and that only, destined to pay Members of the House and Delegates. No other reasonable construction can be given to these provisions of the law. As we have already stated, money has been provided by statute and applied to the fitting up of the office of Sergeant-at-Arms in the manner usual in financial establishments. Money has been appropriated by statute to provide for him a large safe, books of accouut, and other paraphernalia of an office where money is handled. Here again'Congress recognized the financial duties of the officer.
Further legislative sanction for the custom is found in other statutes. Section 40 of the Revised Statutes requires the Secretary of the Senate and the Sergeant-at-Arms of the House to deduct from the monthly payment of Senators and Members the salary for each day’s absence except in case of sickness. *
The Secretary of the Senate is by express terms of statute made a disbursing agent and the linking of these two officers in the same section of the law, with direction to perform the same duty, iudicates the legislative understanding that their responsibilities in regard to compensation of members of the Senate or of the House were similar. What reason could there be for directing the Sergeant-at-Arms to make this deduction unless he was recognized as having the funds under his control out of which these payments were to be made.
Section 45 Speaks again of a disbursing officer of the Hr use who is to pay the member’s compensation ; it does not name him; but when that statute was passed the Sergeant-at-Arms had for many years been acting as a disbursing officer for this purpose.
In January, 1880, the Treasurer of the United States addressed a letter to the Select Committee on Rules of the House of Representatives, calling attention to the practice which had prevailed in regard to the payment of members’ salaries, and recommending that “ one of the officers of the House of Representatives be designated as a disbursing officer, giving such bond as may be required, in the same manner as the Secretary of the Senate is now charged with the disbursement and mileage of Senators ” The matter was very fully explained to the *232 House, and legislation was suggested as necessary to effect the desired end. No statute was passed on the subject, however, but the discussion was followed by the rule which we have already cited, and which contained a most important modification in this: that it specially charged the Sergeant-at-Arms with the duty of paying the salaries, and that not when “required to do so ” by the members as before, but charged him to “ pay them as provided by law; ” so since 1880 the Sergeant-at-Arms pays the salaries under express direction of the rule, whereas prior to this change he had paid only when required to do so by the members.
June 16, 1882 (first session Forty-seventh Congress), a bill was passed in the House of Representatives, by unanimous consent, which made the Sergeant-at-Arms a disbursing officer for the compensation and mileage of Representatives and Delegates ; but this bill did not become a law ; it was referred to .the Committee on Appropriations of the Senate, and we do not find that they took any action upon it. An explanation of this is perhaps to be found in the fact that June 22, 1882, six days after the last-mentioned bill passed the House, the following act of Congress was approved by the President:
“ Whenever any appropriation made tor the payment of the salaries of Senators, Members, and Delegates in Congress, or theofficers and employes of both or either of the houses thereof, or for the expenses of the same, or any committee thereof, can not be lawfully disbursed by or through the officers specially charged with such disbursements, such disbursements may be made for the purpose named in said appropriation by the Treasurer of the United States, who shall take proper vouchers therefor, and charge such disbursements against such appropriations, and the accounts therefor shall be audited and passed or rejected, as the law may require, in the same manner that similar accounts are or may be required by law to be audited and passed or rejected.”
In this statute it is assumed that there existed in the House of Representatives some “ officer specially charged ” with the disbursement of moneys paid by the Government for the salaries of Members and Delegates. It is the statutory recognition of the existence of an officer iu the House charged with duties in relation to members’ pay.
The phraseology of the statute immediately attracts attention, for it does not speak of “ disbursing ” officers. The Olerk *233 of tbe House and tbe Secretary of tbe Senate are botb disbursing officers5 and if tbe statute bad intended simply to refer to them, what more natural than to use this familiar title, to which is attached a fixed legal significance 1 The statute relates not only to the funds controlled by the Secretary of the Senate and to those controlled by the Clerk of the House, but also to those intended for the compensation of the Representatives and Delegates in the House of Representatives, which, under the House rule, were in the charge of the Sergeant-at-Arms. At the time this statute was under consideration, as already stated, there was pending a bill, which had passed the House, intended in express terms to make the Sergeant-at-Arms a disbursing officer for these funds, and a debate upon the subject had just taken place in the House, which, coupled with the debates of 1838 and of 1880, had shown that there existed some doubt as to the powers of the Sergeant-at-Arms in this regard. The pending bill, specifically making the Sergeant-at-Arms a disbursing officer, did not become a law, but the other bill was passed and approved. It speaks not of disbursing officers of the Senate and House, but of “ officers specially charged” with certain disbursements, and the Sergeant-at-Arms was by the rules of the House, and with full understanding of the position by Congress at that time, as before, “ specially charged ” with the disbursement of Members and Delegates’ salaries and mileage.
There is no reason to suppose that this statute of 1882 was passed under any misunderstanding of the law or facts. Congress was familiar with the custom which for many years had prevailed in the House of Representatives and which was the subject of debate; they knew the House rules and the law. It is much more reasonable to infer that, recognizing the existing facts, they deemed .the course theretofore pursued to have been in accordance with law, and that the statute of June 1882, would cure any doubt, than to assume that a mistake wras made in a matter so immediately within the personal knowledge and direct observation of members of Congress.
Even if it be assumed that the Congress had shut their eyes to what was occurring in their midst, and had failed to examine the law or to correctly construe it, still it does not necessarily follow that the statute is without effect. In Postmaster-General v. Early (12 Wheat., 136) the court was required to con *234 strue an act giving certain jurisdiction to the district and State courts. This jurisdiction was to be exercised concurrent with the circuit courts, and there was no grant in this act of power to the circuit courts, Congress erroneously supposing that these courts already possessed this jurisdiction.
Nevertheless the Supreme Court held that the grant to the district and State courts of a j urisdiction which was to be exercised “ concurrent with” the circuit courts conferred jurisdiction upon those courts. The words “ concurrent with,” said Supreme Court, speaking by Chief-Justice Marshall, “perhaps manifest the opinion of the legislature that the jurisdiction was in the circuit courts, but ought, we think, to be construed to give it if it did not previously exist. * * * It is true that the language of the section indicates the opinion that jurisdiction existed in the circuit courts rather than an intention to give it, and a mistaken opinion of the legislature concerning the law does not make law, but this mistake is manifested in words competent to make the law in the future. We know of no principle which can deny them this effect. The legislature may pass a declaratory act which, though inoperative in the past, may act in the future. This law expresses the sense of the legislature on the existing law as plainly as a declaratory act, and expresses it in terms capable of conferring the jurisdiction.”
Courts endeavor to uphold statutes and if possible to give them effect. This statute of 1882 refers to some officer not named, but recognized as in existence and as having power to disburse the money appropriated for members’ salaries; that officer did in fact then exist in the person of the Sergeant-at-Arms. Whether he at the outset was legally authorized to perform the duties in fact imposed upon him becomes now unimportant, as the statute-of 1882, interpreted by the rule of 1880 and the situation when the statute was passed, contains a legislative declaration of the power assumed by Congress then to exist in this officer, a declaration sufficient to operate upon him in the future, and to constitute him thenceforward in law what he had long been in fact (if not in law), a public agent, charged with the duty of paying to Members and Delegates their salaries.
It was argued, in the very excellent brief filed by the defense, and it was pressed in the discussion, that the Treasurer of the *235 United States is the disbursing agent charged with the financial duty performed by the Sergeant-at-Arms. There is no statute which in terms makes the Treasurer a disbursing officer of the House of Representatives, but the defendants rely upon his-general power. The practice would seem to negative this contention, although it is not without considerable force, and has-given rise to much discussion. It may have been understood in the Treasury that the course pursued did not technically involve an advance of money to the Sergeant-at-Arms, perhaps-because the accounts have been kept in the name of the Treasurer. Ou the other hand, the Sergeant-at-Arms, upon presenting members’ receipts and the Speaker’s and Clerk’s certificates,, in fact has been regularly paid in advance the salaries due Members and Delegates, a practice which is forbidden by law'unless-the Sergeant-at-Arms be a public officer with right to disburse Government funds. The position is also negatived by the statute of 1882 (supra),which, in specifying a time when the Treasurer shall pay, may well be held to forbid him from paying at other-times. The course of the Treasury in this matter is subject for argument, but we do find that Department leceiving the Sergeant-at-Arms’s bond and advancing him money in fact through the Treasurer, whose accounts were not balanced until after the entire transaction for each month was closed, and the money was in the hands of the Sergeant-át-Arms.
If the Sergeant-at Arms was a private agent, then the Treasurer violated section 305 of the Revised Statutes, which directs-him to disburse upon warrants drawn by the Secretary, countersigned by the Comptroller, and recorded by the Register; instead of this, trusting to subsequent ratification of his acts, he disbursed upon the certificates of the Speaker or clerk and the-receipts of the members prior to the issue of any warrant, and this practice was ordered by the Secretary and was sanctioned by the Comptroller. Further, section 3648 forbids an advance of public money; yet these moneys were regularly advanced.
The arrangement with the Treasury was made many years ago. It has since been'followed consistently; it was specifically recognized and ratified in 1870, when the Secretary directed the warrant in settlement of the Treasurer’s accounts for this money to issue for a sum in gross after the whole amount had been paid. The course is certainly irregular, but it has the support of convenience and long-continued custom,. *236 and aids in the dispatch of public business; it has been assented to by the legislature and the Executive since the foundation of the Government, and is the continuation of the system which existed prior to the act of 1789.
The Treasury Department has been most carefully administered since its organization, and the only criticisms made upon its officers are based upon allegations of an overstrained care in the protection of the interests of the Government against those of an individual creditor, criticisms which those officers ■can well afford to incur when courts are open to rectify any errors of theirs which may lead to injustice to a citizen. It can not be supposed that these officers have for many years violated the specific provisions of familiar statutes — statutes which it is part of their daily duty to apply. Is it not more reasonable to assume that they find authority for their course in the law as interpreted by rules and custom?
In any event the fact that the Sergeant at Arms, or the Treasurer, or the Comptroller, or the Secretary of the Treasury, followed a practice not in harmony with the statutes or regulations which govern disbursing officers can not operate to the injury of an individual, whether a member of the House of Eepresentatives or aprivate citizen. What rights (if any there be) which the Government may have against the Sergeant-at-Arms or the fiscal agents of the Executive, we are not to examine into or to decide upon, but it is apparent that if they in the administration of their duties failed to comply with the statute or regulation in the manner of performance, while not exceeding their powers in the thing done, no responsibility falls upon a third person ignorant of the illegal manner in which a legal act was done. If the Sergeant-at-Arms was a public agent, authorized by law to pay these salaries, a failure on his part, or on the part of the Treasury officers, to comply with the forms prescribed by law for drawing from the Treasury the money necessary lor this purpose, can not affect the innocent Member or Delegate.
In the view we take of this case it seems unnecessary to more than advert arguendo to the second main point advanced by plaintiff.
It is undoubtedly a general rule, as argued upon his behalf, that where an agent is empowered to collect a debt at a given time payment made to that agent prior to that time is at the *237 peril of the one who pays, or, as Lord Ellenborougli tersely stated it, “Every person who pays money beforehand pays it at bis own risk.” (Parnther v. Gaitskill, 13 East, 432.) It is no less true that, as plaintiff’s salary was not due until December 4, the Speaker’s certificate should have been demanded at the Treasury, as the Clerk, who in fact did sign, was powerless to certify to such an account after December 2, when the Fifty-first Congress convened and elected a Speaker.
On the other hand, it is contended with force, that plaintiff was familiar with the custom of advance payments, which had so long prevailed, and that if by his receipt attached to a blank certificate he did make the Sergeánt-at-Arms his private agent, he is charged with notice of the manner in which such power had been customarily exercised, and must be presumed to have foreseen that the money as heretofore would be paid at the-Treasury to the Sergeant-at-Arms prior to the date when in law due; and as the agent had in fact received the money iu accordance with notorious custom, then his principal cannot disavow his act and fall back upon him who paid.
The rule of the House did not attempt to create in the Sergeant-at-Arms personal agency; this no rule could do unless passed by the consent of every Member and Delegate. No personal relations, therefore, were created by the rule as between this plaintiff and the incumbent of the office. The personal agency, if there were one, arose from the transaction, not from the official position of the Sergeant-at-Arms, and that transaction consisted in the signing of a receipt in blank, understood to-cover a month’s salary, the particular month not being specified, and its deposit with the Sergeant-at-Arms. There remained,, as a legal statutory prerequisite to payment of this salary, a certificate made by the proper officer; without such a certificate no payment could be legally made. The certificate in this case was not signed by the proper officer, but was on its face illegal, because signed by the Clerk when it covered salary due not in vacation, but due after the House had convened and organized, when only the Speaker could sign. Yet, in view of this irregular certificate, to say nothing of the general law of agency as to payments before date, the Government advanced the Sergeant-at-Arms the money.
We can not assume that trained and trusted officers would have made this advance to the private agent of an individual;. *238 and the fact that payment was made in this way, and has for so many years been made in this way, without dissent or criticism, is another argument, drawn from long executive construction, tending to- confirm the result we reach that the -Sergeant-at-Arms acted as a public officer.
Since the organization of the Government, the House of Representatives has retained control of the payment of the salaries of Members and Delegates. The Congress which established the Treasury Department intended to reserve to the House the power previously exercised by it, and this power was exercised always thereafter by officers of the House; first, by the Speaker directly, then by the Speaker acting through the Sergeant-at-Arms as his subordinate; then by the Sergeant-at-Arms acting under direction of the House as expressed in the rules. No change has been made in the practice except in its details of administration ; it is public, uniform, long continued, expressly sanctioned by the House, and not objected to by the Treasury, which has recognized it and acted in harmony with it. Usage can be appealed to for the interpretation of statutes, and we find the only reasonable construction of the statutes relating to this subject is the one which harmonizes with the usage. We all> agree that judgment shall be entered in plaintiff’s favor in the sum of $366.