**ROMNEY v. UNITED STATES.**

No. 9561.

United States Court of Appeals
District of Columbia.

Argued Nov. 18, 1947.

Decided March 22, 1948.
Writ of Certiorari Denied June 14, 1948.
See 68 S.Ct. 1512.

Mr. William H. Collins, of Washington, D. C., for appellant.

Mr. George Morris Fay, United States Attorney, of Washington, D. C., with whom Messrs. John W. Fihelly and Sidney S. Sachs, Asst. United States Attorneys, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTYMAN, Associate Justices.

WILBUR K. MILLER, Associate Justice.

This is an appeal by Kenneth Romney, formerly Sergeant at Arms of the House of Representatives of the United States, from a judgment of conviction entered against him in the District Court of the United States for the District of Columbia. A jury found him guilty of presenting to the General Accounting Office certain false statements of his accounts, and of concealing a shortage by trick, scheme, and device, in violation of Title 18, § 80, U.S. C.A.[1]

The nature of the accounts and the falsification of them charged against the appellant can be readily understood from a description of one of the principal functions of the Sergeant at Arms, and his method of performing it. Romney handled public money and kept official financial records because the Sergeant at Arms of the House of Representatives, in addition to the traditional duties of such an officer, is directed by statute to "keep the accounts for the pay and mileage of Members and Delegates, and pay them as provided by law."[2]

Since he must be furnished with public funds for that purpose, the Congress appropriates, at the beginning of each session, a sum sufficient to cover the salaries and mileage of the legislators during that session. This action constitutes the authority of the Treasury to place to the credit of the Sergeant at Arms such portions of the appropriation as are requisitioned by him. Under the established custom, each month the Sergeant at Arms draws a requisition on the Treasury to cover the compensation of Representatives for that month; and, usually at the beginning of the session, an additional amount to cover mileage. He gives checks drawn on the Treasury to those Congressmen who desire to be paid in that way, but he withdraws from the Treasury and keeps in his office at the Capitol actual cash sufficient in amount to cover the salaries of other Congressmen who prefer to obtain their compensation by writing orders to the Sergeant at Arms for such portions of their salaries as from time to time they desire to receive. The orders are similar in appearance to bank checks. Equipped with bank-like fixtures and commonly called the "House Bank," the office of the Sergeant at Arms is a place where Congressmen may cash their orders upon him, their Treasury checks, or checks drawn on commercial banks. But the "House Bank," unlike a commercial bank, does not receive deposits and cannot *legally* lend any of the cash on hand.

---

[1] "§ 80.  (Criminal Code, section 35 (A).)  Presenting false claims.

"Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

[2] Act October 1, 1890, c. 1256, § 1, 26 Stat. 645, 2 U.S.C.A. § 78.

Because of the considerable number of Congressmen who choose to draw their salaries and mileage by means of orders on the Sergeant at Arms, that official necessarily keeps on hand in his office large sums in coin and currency. Except for the arrangement just described, there would be no occasion for the Sergeant at Arms to have cash in his office, for otherwise all salaries and mileage would be paid by checks drawn on the Treasury of the United States; indeed, there can be no cash in his hands except that which he gets from the Treasury to meet the salary and mileage orders drawn upon him.

The events which brought about the accusation and condemnation of the appellant began in 1925, when he was the cashier in the office of the Sergeant at Arms. J. H. Smithwick was then a member of the House of Representatives. He and Romney became associated in Florida real estate operations, which were so unsuccessful that both men lost heavily. During the following six years, Smithwick, with the cooperation of Romney, "kited" checks through the office of the Sergeant at Arms in an aggregate of more than a million dollars: When his regime ended at the close of 1946, Romney held the Congressman's worthless checks amounting to $87,538.12. Smithwick was defeated for reelection in 1928, although he used in his campaign $20,000 furnished to him from the till of the Sergeant at Arms. Writing to Smithwick under date of December 3, 1931, Romney, then having been advanced from cashier to Sergeant at Arms, graphically described the situation in this language:

"To call you back to bitter realities, you have had the use of approximately a million dollars in the last seven years, or since 1925. For a period of only one month in the spring of 1928 have you ever in those seven years been out of debt to this office for sums ranging from $5,000 to $40,000. You have been in and out continuously since that time, but the checks held and 'kited' through this office would easily approximate a million dollars and made possible all of your operations both in Florida and Maryland, however they may have resulted."

In the same letter he later added:

" * * * When the time comes I shall make a truthful statement of the whole situation and take the consequences. You will have to take them too. We have been jointly guilty of fraud. You know that as well as I do. And I will say more, that if you had never come to Congress I would not be in trouble today. You involved me in Florida in 1925 in order to get the use of my money and I have never been able to retrieve myself, but have backed you without stint as the best bet to pull me out."

Romney discovered in November, 1938, that he was not alone in his peculations. Frank J. Mahoney, who had been employed in the appellant's office from the time the latter became Sergeant at Arms in 1931, then confessed that he had embezzled slightly more than $25,000 from the funds of the office. The surety on Mahoney's bond of $10,000 was not called upon to pay because Romney said, as a witness related, that "he did not see how we could, because it would not cover the amount that he had taken, and he said it would ruin the prestige of the office and ruin us all."

Two worthless checks aggregating $8,000, which had been cashed in 1929 and 1930 for a former bookkeeper, H. A. McKenzie, were being carried as cash when the end came. There were also worthless checks of two other individuals which amounted to $3,500, and checks drawn by the appellant himself, all of which were carried and reported in the same manner.

As had his predecessors, Romney sent to the General Accounting Office monthly statements of the status of his accounts, called "accounts current." Each included an item denominated "Balance now due the United States" and a breakdown of that item into three subheads, one of which is "Cash on hand." Manifestly the cash on hand shown on each account current was the cash remaining from that drawn from the Treasury to meet the orders of Congressmen for salaries and mileage, since there was no other purpose for which he could obtain government money.

The indictment charged that in his accounts current for May and October, 1946,

Romney falsely represented the item of "Cash on hand" to have been greater by $143,863.77 than it actually had been at the end of those months. It was also charged that throughout the first ten months of 1946, by trick, scheme, and device, he had concealed from the General Accounting Office a shortage in his accounts amounting to $143,863.77.

The appellant does not deny the falsification of the two accounts current, nor the existence of the shortage and its concealment. He argues that those acts were not violative of the statute, and in his brief summarizes his position in that respect in this language:

"(a) There was no requirement in law that the Sergeant At Arms of the House of Representatives make report to the General Accounting Office.

"(b) That if it could be construed that the Sergeant At Arms was required to make report to the General Accounting Office he nevertheless was not required to report to the General Accounting Office as to money that had gone into 'The House Bank'."

There are before us, then, two questions: (a) were the books and affairs of the Sergeant at Arms within the jurisdiction of the General Accounting Office so that monthly accounts current were required to be submitted to that agency, and (b) who had title to the cash in the office of the Sergeant at Arms when it was misappropriated?

As to the first question, we shall examine the applicable statutes, without stopping to notice the long-continued and highly persuasive administrative interpretation of them which was implicitly made by Romney himself, and by his predecessors as well, in filing accounts current with the General Accounting Office.

Pertinent provisions of the statutes are quickly summarized. The Sergeant at Arms is required to keep the accounts of, and to pay, the salaries and mileage of Congressmen.[3] For that purpose, he is a disbursing officer of the United States, authorized to requisition from the Treasury the funds necessary therefor, which he must keep, disburse and account for as required by law.[4] Before receiving any portion of the moneys appropriated for the compensation or mileage of Members and Delegates, the Sergeant at Arms must give a bond to the United States in the sum of $50,000, "with condition for the proper discharge of the duties of his office, and the faithful keeping, application, and disbursement of such moneys as may be drawn from the Treasury. and paid to him as disbursing officer of the United States, * * *."[5]

The General Accounting Office is required to receive and examine all accounts relating to the House of Representatives and, according to the character of the account, to certify the balances thereof to its Clerk or Sergeant at Arms.[6] Moreover, all disbursing officers of the United States must render monthly accounts to the General Accounting Office.[7]

These provisions of law, standing alone and without the aid of related statutes which we think it unnecessary to cite, abundantly demonstrate a legislative purpose to have the General Accounting Office scrutinize the accounts of the Sergeant at Arms.

But, the appellant urges, these enactments do not apply to the Sergeant at Arms because the House of Representatives acts as its own auditor, to the exclusion of any other governmental agency. In support of that theory he points to three sections of the Code and to certain rules of the House of Representatives.

The first provision of law cited by him in this connection is that which directs the Sergeant at Arms to prepare and submit to the House, at the commencement of each

---

[3] Act October 1, 1890, c. 1256, § 1, 26 Stat. 645, 2 U.S.C.A. § 78.

[4] Act October 1, 1890, c. 1256, § 3, 26 Stat. 645, 2 U.S.C.A. § 80.

[5] Act October 1, 1890, c. 1256, §§ 4, 5, 26 Stat. 646, as amended, 2 U.S.C.A. § 82.

[6] Act July 31, 1894, c. 174, § 7, 28 Stat. 206 as amended, 31 U.S.C.A. § 72.

[7] R.S. § 3622, Act, February 27, 1877, c. 69, § 1, 19 Stat. 249 as amended, 31 U.S.C.A. § 496, and Act, August 30, 1890, c. 837, § 4, 26 Stat. 413 as amended, 31 U.S.C.A. § 497, and regulations validly promulgated under the latter provision.

regular session of Congress, a written statement showing the several sums drawn by him for salaries and mileage, "the application and disbursement of the same, and the balance, if any, remaining in his hands." [8] This section does not, either in terms or by implication, relieve the Sergeant at Arms of the duty of filing statements with the General Accounting Office.

His second reference is to that section which makes it the duty of the Committee on Accounts of the House of Representatives to inquire into the enforcement of §§ 85 to 90 inclusive of Title 2 of the United States Code annotated.[9] None of the six sections of the Code mentioned in Title 2, § 91, concerning the enforcement or violation of which the Committee on Accounts is directed to inquire, has to do with the accounts of the Sergeant at Arms or with the auditing or supervising of those accounts.

The third and last Code provision relied upon by the appellant to exempt his office from reporting to the General Accounting Office is that which reads in part as follows:

"All payments made out of the contingent fund of the House of Representatives upon vouchers approved by said temporary committee on accounts shall be deemed, held, and taken, and are hereby declared to be conclusive upon all the departments and auditing officers of the Government." [10] This language, applicable only to the contingent fund of the House, neither provides nor indicates that the House of Representatives itself, or one of its committees, is the sole supervisor of the accounts of the Sergeant at Arms.

The appellant cites also Rules IV, X and XI of the House of Representatives. But examination shows them to be no more helpful to his position than are the three statutes just discussed.

■ We hold that it was the legal duty of Romney as Sergeant at Arms to submit to the General Accounting Office the accounts current which he did submit; and that it was the legal duty of the General Accounting Office to receive and examine those accounts, and to certify the balances arising thereon.

The second problem in the case, which is to determine the ownership of the cash on hand in the office of the Sergeant at Arms when it was misappropriated, arises because Romney argues that, even if he was required by law to submit accounts current to the General Accounting Office, nevertheless he was not required to show in them the amount of cash on hand because that cash was not the property of the United States, but of the individual Congressmen whose salaries and mileage it represented. In drawing that money from the Treasury, he contends, he was acting as the agent of the Representatives who had elected to receive their pay by drawing orders upon him for it; and that in keeping it on hand in his office, he was keeping it as the private banker of the Members and Delegates, subject to their checks.

■ The appellant says that, therefore, he was mistaken in reporting the cash on hand as a part of the item denominated "Balance now due the United States," because the cash did not in truth belong to the United States, but to the Congressmen. He argues that cash due from him as an individual to other private individuals was not lawfully the concern of the General Accounting Office, and consequently his falsification of the item of cash on hand was not a violation of the statute. There is necessarily implicit in that argument the assertion that, when he drew the money from the Treasury, it instantly ceased to be public money and was not held thereafter by him in his capacity as a disbursing officer of the United States, but as a private person acting for other private individuals.

This contention is not new. It was asserted in 1890 by the defendant in the case of Crain v. United States, 25 Ct.Cl. 204. Crain was a Congressman whose salary for November, 1889, was unpaid because of

[8] Act October 1, 1890, c. 1256, § 7, 26 Stat. 646, 2 U.S.C.A. § 84.

[9] Act March 3, 1901, c. 830, § 1, 31 Stat. 968, 2 U.S.C.A. § 91.

[10] Act March 2, 1895, c. 177, § 1, 28 Stat. 768, 2 U.S.C.A. § 97.

a shortage in the cash held by the Sergeant at Arms, caused by an embezzlement by a subordinate. He sued the United States and the latter defended on the theory which is here advanced by the appellant.

The question was stated by the Court of Claims in this way: "When the Sergeant-at-Arms presented to the Treasurer plaintiff's receipt for November salary, with the Clerk's certificate, and received the cash therefor, was he acting as a public agent or as plaintiff's personal agent?" The court pointed out what was then true, that no statute in express terms made the Sergeant at Arms a disbursing officer of the government. In a carefully prepared opinion the Court of Claims reached the conclusion that the House had assigned the duties of a disbursing officer to its Sergeant at Arms in regard to the one subject of paying salaries and mileage, and that he was in fact such officer although he had not been specifically designated as such. So it was held that in receiving the money from the Treasury, the Sergeant at Arms acted as a public agent.

The Crain case was decided by the Court of Claims on March 1, 1890. Congress observed the court's comment that no statute expressly made the Sergeant at Arms a disbursing officer and proceeded, by an act approved October 1, 1890, to close the legislative gap which the court had noticed.[11] It provided in express terms that the Sergeant at Arms should be a disbursing officer of the United States, authorized to requisition from the Treasury funds with which to pay salaries and mileage, and directed him to keep, disburse and account for that money as required by law. That is to say, Congress made the Sergeant at Arms a disbursing officer de jure to clinch the de facto status as such which the court

had found to exist. We do not find the term "disbursing officer" statutorily defined, probably because it is self-definitive. It can mean nothing except an officer who is authorized to disburse funds of the United States. Cash in the hands of such an official manifestly continues to be the property of the government until it has actually been disbursed by him to persons lawfully entitled to receive it.

In addition to the foregoing, another pertinent provision of law is overlooked when it is asserted that cash drawn by the Sergeant at Arms from the Treasury ceases to be public money when it reaches his hands. It is that provision,[12] already alluded to in another connection, which requires him to give bond conditioned on "the faithful keeping, application, and disbursement of such moneys as may be drawn from the Treasury and paid to him as disbursing officer of the United States, * * *." The act so providing was adopted, as we have seen, in 1890, when the "House Bank" had long been in operation, and when Congress knew the only money the Sergeant at Arms could draw in cash from the Treasury was that destined to pay salary and mileage orders drawn by Congressmen. It it therefore true that when the act spoke of that cash as being "paid to him as disbursing officer of the United States", it was plainly saying that, in receiving it, he was receiving government money to be disbursed by him for the government in his official capacity as a disbursing officer.

Arguing further on this subject, the appellant draws attention to the Supplemental Appropriations Act for the Fiscal Year Ending June 30, 1948, which was Public Law 271 adopted by the 80th Congress and

---

[11] The bill which became a law on October 1, 1890, to which we have referred, was prepared by the select committee appointed to investigate the accounts of the Sergeant at Arms of the House and was introduced on September 25, 1890. The committee's spokesman, in commenting on the measure, said in part:

"* * * We have also in express terms made the Sergeant-at-Arms a disbursing officer. We have also provided that he may draw from the Treasury on his own requisition the amount of the

salaries and the mileage of Members and Delegates and pay it to them in the amounts provided by law." (21 Cong. Rec. 10449 (1890).)

He later added (at p. 10450):

"Mr. Speaker, this bill follows the language of the Revised Statutes in making the Secretary of the Senate a disbursing officer; and it also follows the decisions of the Court of Claims declaring that the Sergeant-at-Arms of the House was such an officer."

[12] See note 5 supra.

approved July 30, 1947, 61 Stat. 610. In that measure, under the heading "House of Representatives", appears the following:

"Salaries, Mileage, and Expenses of Members

"For compensation, mileage and expense allowances due and unpaid to Members of the House of Representatives, Seventy-ninth and prior Congresses, $83,879.22."

This was the amount of the net shortage, as finally determined by the auditors, after recoveries from the sureties on official bonds. The appellant then makes in his brief the following statement:

"If the money therein provided for, which is the unpaid balance of the funds herein involved, was a public fund then there would have been no necessity for the appropriation provided for in this particular act."

Whether the appellant's conclusion just quoted is a sound one is quite immaterial to our decision. For reasons heretofore given we have no difficulty in concluding that it was public money which was embezzled. There may have been no necessity for the appropriation of July 30, 1947, as the appellant asserts; whether there was or not we need not and do not decide. It is certain, in our view, that the unnecessary action of Congress in making a fresh appropriation, if it was unnecessary, cannot affect or disturb the fact that public money was misappropriated. That the new appropriation was made may indicate that the Treasury felt it had satisfied the original appropriation by paying the cash to Romney who had been authorized by Congress to withdraw it, and therefore believed itself unauthorized to part with new cash without the express authority of a new appropriation. Be that as it may, our conclusion remains that the money which was embezzled was the property of the United States. We also hold that cash drawn from the Treasury by the Sergeant at Arms is properly reported in his accounts current as part of the item styled "Balance now due the United States."

The appellant further argues that the court erred in overruling his motion to dismiss the indictment on the ground that the grand jury that returned it was illegally constituted. His affidavit in support of the motion showed that on January 7, 1947, several hundred persons who had been summoned for jury service appeared in the District Court of the United States for the District of Columbia. A deputy clerk called their names from a list and as each person answered he was asked if he desired to be excused. After those who indicated that desire had stepped aside, there remained approximately fifty persons who did not wish to be excused. The members of that group were then further interrogated as to their qualifications and from them twenty-three were finally selected as the grand jury which later indicted him. This, the appellant argues, was a jury composed of volunteers, and was one not made up in accordance with the requirement of law.

One present in court in obedience to summons to appear for jury service is not to be described as a volunteer merely because he does not ask to be excused. Moreover, it is well established that a motion to dismiss an indictment on the ground of irregularity in the drawing or impaneling of the grand jury must show with exactness that the irregularity complained of tended to the movant's injury and prejudice, and that it must set out the particular respects in which it did so tend.[13] The language of Chief Justice Groner in Medley v. United States [14] is applicable in this case: "Here, nothing is shown or alleged to the damage or hurt of defendant, and without it the allegation of mere irregularity in drawing or impaneling the Grand Jury is not enough."

Complaint is also made that the grand jury as finally constituted contained thirteen government employees. That preponderance of government employees was due to the fact that government employment is more extensive than private em-

[13] Agnew v. United States, 165 U.S. 36, 44, 17 S.Ct. 235, 41 L.Ed. 624; United States v. Parker, 3 Cir., 103 F.2d 857, certiorari denied, 1939, sub nom. Park-

er et al. v. United States, 307 U.S. 642, 59 S.Ct. 1044, 83 L.Ed. 1522.

[14] 81 U.S.App.D.C. 85, 155 F.2d 857, 859, certiorari denied, 1946, 328 U.S. 873, 66 S.Ct. 1377, 90 L.Ed. 1642.

ployment in the District of Columbia. Such employees are eligible for jury service.[15]

One more assignment of error remains to be noticed. A witness testified that a Member of Congress suggested to Romney how he might replace the money embezzled by Mahoney. The suggestion was "that they carry the position at the same salary Frank Mahoney had been paid, but to get someone at a lower salary and use the difference to make up the shortage." Romney acted upon that advice. At this testimony, appellant says the trial justice shook his head and "indulged in a smile," action which he urges was prejudicial and reversible error. The presiding justice said, when the point was made in argument on a motion for a new trial, "Yes, I smiled at the suggestion of Mr. Solomon."

The naivete of the Congressman in making this suggestion and of the appellant in acting upon it understandably caused the presiding justice to indulge in a smile. It was a plan to practice a new fraud on the United States in order to get money to repair the damage done by an old one, and was a direct violation of the statute which makes it unlawful to require or permit any employee of the House of Representatives to divide his salary or compensation with another.[16] It does not appear that the jurors saw the judge's indication of amusement. Even if they did, it is speculative to say they interpreted it as a comment on the evidence unfavorable to the appellant. This error was, in our view, far too slight to be cause for reversal.

A careful examination of the record discloses no basis for disturbing the judgment of the District Court.

Affirmed.

---

[15] Higgins v. United States, 81 U.S. App.D.C. 371, 160 F.2d 222, certiorari denied, 1947, 331 U.S. 822, 67 S.Ct. 1304.

[16] Act March 3, 1901, c. 830, § 1, 31 Stat. 968, 2 U.S.C.A. § 86.