**UNITED STATES of America**

v.

**Charles C. DIGGS, Jr., Appellant.**

**No. 78–2327.**

United States Court of Appeals, District of Columbia Circuit.

Argued 11 June 1979.

Decided 14 Nov. 1979.

Rehearing Denied Jan. 30, 1980.

---

Bernard J. Carl, Washington, D.C., a member of the bar of the Supreme Court of Virginia, pro hac vice, with whom David Povich, Robert Barnett, and Robert Watkins, Washington, D.C., were on the brief, for appellant.

Peter E. George, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry, John T. Kotelly, and Eric B. Marcy, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before LEVENTHAL and WILKEY, Circuit Judges and OBERDORFER,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

Concurring opinion filed by District Judge OBERDORFER.

Dissenting opinion filed by Circuit Judge LEVENTHAL.

WILKEY, Circuit Judge.

The defendant Charles C. Diggs, Jr., United States Congressman for the 13th District of Michigan, appeals from a conviction on eleven counts of mail fraud, under 18 U.S.C. § 1341,[1] and eighteen counts of making false statements to a United States agency, under 18 U.S.C. § 1001,[2] following a

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 18 U.S.C. § 1341 provides:
   § 1341. Frauds and swindles
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
   18 U.S.C. § 1341 (1976).

2. 18 U.S.C. § 1001 provides:
   § 1001. Statements or entries generally
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   18 U.S.C. § 1001 (1976).

jury trial before Judge Oliver Gasch of the United States District Court.[3] The defendant was sentenced to concurrent terms of incarceration of three years on each count.

The indictment alleged that between 1 July 1973 and 2 March 1977 the defendant devised a scheme to defraud the United States by misapplying funds allotted for the compensation of congressional employees.[4] On this appeal, the defendant does not challenge the sufficiency of the evidence but contends rather that he lacked the requisite intent to defraud and that he acted within the bounds of his discretion to set the duties and salaries of his congressional employees. For the reasons discussed herein, we reject the defendant's arguments and affirm his conviction on each of the twenty-nine counts.

## I. FACTUAL BACKGROUND

At different periods from October 1973 to January 1977, three of defendant Diggs' congressional employees—Jean G. Stultz, Felix R. Matlock, and Ofield Dukes—paid out of the salary allotted to them from the congressional clerk-hire allowance various personal, business, or official expenses of the defendant. That these payments were made is not contested by the defendant; thus a detailed itemization of each of the transactions need not detain us. What is disputed by the defendant are the questions of whether the clerk-hire allowance could be used to defray his congressional expenses[5] and whether the employees' expenditures were made at his direction.

Congressman Diggs hired Jean G. Stultz in 1972 as a legislative assistant and in the following year promoted her to his personal secretary and staff office manager. In October 1973 Diggs placed Mrs. Stultz on both his personal staff and committee staff payrolls, for which she received two monthly salary checks of approximately $800 and $1,200.[6] Although Stultz deposited both paychecks into her own checking account, she allocated the $1,200 monthly check to obligations of the defendant—either personal or congressional ones.[7] In August

---

**3.** Appellant was originally charged in an indictment of thirty-five counts; the Government dismissed three counts each of mail fraud and false statements before trial.

**4.** Counts 1 through 11 charged violations of 18 U.S.C. § 1341; counts 12 through 29 charged violations of 18 U.S.C. § 1001. Briefly summarizing the counts of the indictment, counts 1 through 4 alleged that Congressman Diggs engaged in a scheme to defraud the United States by inflating the salary of Felix R. Matlock, a congressional employee, as a means of paying various personal, business, and House of Representative expenses; counts 5 through 7 and 8 through 11 charged that Congressman Diggs placed on the congressional payroll Jeralee Richmond and George Johnson as compensation for services rendered either to defendant Diggs personally or to the family business, the House of Diggs. Counts 12 through 29 alleged that the defendant filed materially false and misleading Payroll Authorization Forms with the House of Representatives Office of Finance: counts 12 through 20 charged that he concealed from the agency the fact that he inflated the salaries of Jean G. Stultz, Felix Matlock, and Ofield Dukes with the intention of using the increase in their salaries to meet his own personal and congressional obligations; and counts 21 through 23 and 24 through 29 charged that the defendant placed George Johnson and Jeralee Richmond on the payroll to compensate them for services that were unrelated to the defendant's congressional duties.

**5.** Defendant concedes that it "may have been improper for an employee to be compensated from the clerk-hire allowance for the payment of personal expenses." Brief for Appellant at 28. As a tactical matter, defendant had no need to assert the propriety of those types of expenditures because the Government tried its case on the theory that either type of expenditure—for personal and business expenses or for congressional expenses—was illegal. See notes 31–32 infra and accompanying text.

**6.** Her actual combined net monthly salary was $2,142.14. Her gross annual staff salary as of October 1973 was $19,000.00; her gross annual committee salary, $14,667.80, making a total gross of $33,667.80. See Gov't Exhibit No. 75, Appendix for Appellee at 281. No argument is advanced that it was improper, standing alone, to compensate Mrs. Stultz from two payrolls.

**7.** A check payable to the order of "Cash" for $1,250.00, dated 2 November 1973, was the first expenditure of record. This check substantially was used to defray an arguably personal expense of the defendant ($1,000 toward a portrait of the defendant to hang in the House of Representatives), and the balance to cover expenses related to the Congressman's official duties.

1974 defendant removed Stultz from his personal staff payroll and substantially increased the salary she received from the committee staff payroll "almost to a figure to cover the total amount that [she previously received] in the two checks."[8] From this increase in salary, Stultz continued to pay the defendant's personal and congressional creditors on a regular basis.[9]

Mrs. Stultz testified that in March or April 1976 she informed the defendant that she "no longer wanted to be a part of [it]."[10] Her gross annual salary was reduced in April 1976 from $37,355.00 to $22,700.00.[11] The decrease in salary was accompanied by no change in duties.

One fact of importance on this appeal is whether the defendant's bills were paid "at the direction of Congressman Diggs," as Mrs. Stultz testified,[12] or on Mrs. Stultz's own volition, as the defendant contends. Mrs. Stultz testified that the defendant approached her with the notion that her salary be increased in order to pay certain of his bills, and that the scheme, after some initial objection on her part,[13] was then set into motion: each month she would make a listing of all of the defendant's accounts, she and the defendant would review this list, and the defendant then would direct her as to which bills were to be paid from the inflated portion of her salary.[14] After this decision was reached, Stultz purchased either money orders or cashier's checks, placed the defendant's name on these instruments, and mailed them to the defendant's creditors.[15] Defendant Diggs, on the other hand, denied increasing Mrs. Stultz's salary for the purpose of paying his bills, and he also denied directing her to make these payments. He testified instead that Mrs. Stultz "expressed a willingness" to discharge his obligations.

Felix R. Matlock, one of the defendant's field representatives in Detroit, also paid expenses of the Congressman from his salary. The bulk of these expenditures were made over an eighteen-month period from September 1975 to January 1977.[16] With one minor exception,[17] all of these were congressionally related and most were in some way related to the operations of the

8. Record (28 Sept. 1978) at 43 (testimony of Jean G. Stultz). Her gross annual salary was $36,000.00, with a monthly net of $1,846.75. See Gov't Exhibit No. 75, Appendix for Appellee at 282.

9. Over a two and one-half year period, from November 1973 through March 1976, Stultz expended a total of $20,413.16 toward the defendant's personal and congressional obligations from her increased salary. Over one-half of that amount covered personal expenses of the defendant (e. g., life insurance premium payments, home mortgage payments, etc.), while almost one-third went toward congressionally related expenses (e. g., rent for the defendant's district offices in Detroit, political contributions, printing costs). It cannot be said with certainty whether the balance covered personal or congressional expenses. See Gov't Exhibit Nos. 76 & 77, Appendix for Appellee at 284.

10. Record (29 Sept. 1978) at 37.

11. Prior to her resignation on 30 August 1976, the defendant increased Mrs. Stultz's salary to $37,355.00 for the months of July and August 1976 so that she could pay her inflated taxes. For a complete breakdown of the fluctuations in Stultz's salary, see Gov't Exhibit No. 75, Appendix for Appellee at 281–83.

12. Record (28 Sept. 1978) at 106.

13. Mrs. Stultz testified that she participated in the scheme despite her reservations because she "felt that it was almost—you might almost say a condition of employment. [She] received no threats but it was by sort of innuendo." Record (29 Sept. 1978) at 42.

14. Mrs. Stultz and the defendant referred to the overage in her salary as the "special account," although no separate banking account physically was established.

15. Mrs. Stultz also wrote personal checks to pay the defendant's creditors. Stultz testified that she was allowed to retain the entire proceeds of her paycheck once each year for tax purposes.

16. Matlock paid a few, relatively insubstantial congressional expenses in 1973 and 1974.

17. The one exception being a money order, dated 6 July 1976, payable to North Carolina Mutual (for an insurance policy on Congressman Diggs) in the amount of $17.68.

defendant's district offices in Detroit.[18] Corresponding with that time period, the defendant significantly increased Matlock's salary: Matlock's annual gross salary jumped from $14,500.00 in July 1975 to $35,000.00 in September 1975, and to as much as $39,600.00 by the end of 1976.[19]

Again, the dispute does not center on whether the defendant authorized the increases in Matlock's salary or whether Matlock actually paid the defendant's district office expenses, but whether the two events were part and parcel of the same scheme, perpetrated by the defendant. Mrs. Stultz testified that Matlock's salary was increased in order to pay the defendant's district office expenses, while the defendant denied adjusting Matlock's salary for this purpose. Both Matlock and Stultz testified that on the defendant's instructions, Mrs. Stultz advised Matlock which bills were to be paid.[20] Consistent with and in confirmation of this, Matlock also asserted that he received orders from the defendant personally following Mrs. Stultz's resignation in August 1976. Diggs, on the other hand, claimed that he did not instruct Matlock either directly or indirectly on which bills were to be paid.

In December 1976 Matlock stopped making payments toward the defendant's official expenses.[21] In the following month, the defendant reduced Matlock's gross annual salary from $39,600.00 to $20,000.00 with no apparent change in duties.[22]

Ofield Dukes, hired in April 1973 as a consultant, paid official expenses of the defendant at various times from June 1973 through January 1976.[23] Dukes testified that he received instructions on which bills to pay from Mrs. Stultz and that he was reimbursed for these expenditures through increases in his salary. His base pay of $12,000.00 was raised to as much as $37,300.00 in November 1975, and finally dropped back to $12,000.00 in February 1976, when Dukes ceased to discharge the defendant's obligations.[24]

Finally, the indictment alleges that Jeralee Richmond and George Johnson performed no congressionally related work while they were compensated from the congressional payroll. Defendant placed Jeralee Richmond on the congressional payroll in July 1974 at a salary of $8,500.00. She was employed at the House of Diggs' Funeral Home in Detroit as a bookkeeper, and she was also expected to deal with problems of constituents who came to the funeral home. Richmond testified that while on the House rolls from July 1974 to August 1976, approximately twenty percent of her time was apportioned to handling constituents' problems and eighty percent to bookkeeping matters of the funeral home.[25]

18. The expenditures, which are evidenced by copies of money orders or cashier's checks, total $10,952.31 and include payments for such items as rent on the district offices (two actual offices and a mobile unit), media advertising costs, and electricity costs for the district offices.

19. *See* Gov't Exhibit No. 78, Appendix for Appellee at 288.

20. Matlock then either sent the money to Washington or paid the bills directly through money orders or cashier's checks. Matlock testified that he retained seven percent of his increased paychecks for tax purposes.

21. Matlock claimed he only adhered to the arrangement because he "didn't want to make any waves." Record (30 Sept. 1978) at 17.

22. The Government calculated that the total excess in Matlock's salary from August 1975 through December 1976 was $26,962.95 computed over a base of $14,500.00 (Matlock's gross annual salary as of July 1975). *See* Gov't Exhibit No. 78, Appendix for Appellee at 288.

23. For example, Dukes on occasion paid for political advertising for the defendant. In two instances Dukes covered obligations of the House of Diggs (totaling $1,148.40) but insisted that these bills were paid inadvertently.

24. The total excess in Dukes' salary, computed from a base of $12,000.00 was $15,945.81. *See* Gov't Exhibit No. 80, Appendix for Appellee at 292.

25. Mrs. Richmond originally was employed as a bookkeeper for the House of Diggs from 1949 to 1967. During that period, she handled the same sorts of matters that she did while on the congressional payroll—bookkeeping work and constituents' problems—but she received no compensation for the latter function from House funds.

The defendant did not dispute her testimony. At no time during this period did Mrs. Richmond receive any compensation from the House of Diggs: her entire salary derived from the congressional clerk-hire funds.[26]

George Johnson, a certified public accountant in Detroit, was the defendant's personal accountant and the accountant for the House of Diggs. From July 1973 to December 1974, Johnson received compensation from the congressional clerk-hire allowance. While on the House payroll, Johnson continued to render accounting services to the defendant personally and to the House of Diggs. Defendant does not dispute that fact, asserting, however, that Johnson also aided him in his official capacity. Defendant testified that he hired Johnson as an adviser to draw upon Johnson's "knowledge and expertise and involvement in the community with respect to black economic development projects."[27] Johnson testified, on the other hand, that he did no "financial or accounting work for Congress" and that he had doubts about receiving compensation from the clerk-hire funds.[28] As a result, Johnson quit the congressional payroll in December 1974.[29]

## II. ANALYSIS

The scheme to defraud set forth in the indictment has two subparts: (1) the allegation that the defendant "inflated the salaries of Jean G. Stultz, Felix R. Matlock and Ofield Dukes in order to pay for various personal, business and House of Representatives' expenses of defendant Diggs," and (2) the allegation that the defendant placed on the House of Representatives' payroll Jeralee Richmond and George Johnson "who performed no work for the House of Representatives."[30] We will consider first that part of the alleged scheme to defraud involving the increases in the salaries of Matlock, Stultz, and Dukes.

### A. The Scheme to Defraud: Inflated Salaries of Congressional Employees

#### 1. The Clerk-Hire Allowance

■ The Government tried its case against the defendant on the rationale that using clerk-hire funds to pay *either* the Congressman's personal and business expenses *or* his official expenses was illegal. The Government combined in the same counts of the indictment transactions relating to both types of expenditures.[31] Although defendant admits that it "may have been improper for an employee to be compensated from the clerk-hire allowance for the payment of personal expenses,"[32] he asserts that use of the clerk-hire allowance to pay certain of the district office expenses was entirely proper. Thus, putting aside for a moment the question of the defendant's *intent* in increasing his employees' salaries, we must decide in the first instance whether drawing on clerk-hire funds to meet either the defendant's personal or congressional expenses was illegal. We hold that it was.

The clerk-hire allowance is an appropriation by Congress providing compensation

26. Jeralee Richmond received a total of $20,-291.64 from the congressional payroll. *See* Gov't Exhibit No. 81, Appendix for Appellee at 294.

27. Record (4 Oct. 1978) at 85.

28. Record (30 Sept. 1978) at 172.

29. Johnson also testified that by the spring of 1973 the defendant personally owed him between $2,000.00 and $10,000.00 and that the House of Diggs was also indebted to him. He reduced the House of Diggs' indebtedness by the amount of money he received as salary from the clerk-hire allowance, a total of $19,-166.02.

30. The payroll transactions for employees Matlock, Richmond, and Johnson form the basis of the mail fraud counts; the payroll transactions for all five employees, the basis of the false statement counts.

31. To simplify, we shall refer to the Congressman's personal and business expenses as "personal expenses." Although some of the counts involve only payments of congressional expenses, no count relates solely to payments of the defendant's personal bills.

32. Brief for Appellant at 28.

"[f]or staff employed by each Member in the discharge of his official and representative duties." [33] On hiring an employee or on adjusting the amount of compensation that an employee will receive, a congressman must submit a "Payroll Authorization Form" to the House of Representatives Office of Finance, marking on the form either the entry entitled "Appointment " or the one designated "Salary Adjustment." The obvious reading of this payroll form is that the monies received will accrue to the employees' sole use and benefit as salary for services rendered. It rules out by implication any other use of the funds.

In Diggs' case the defendant submitted the payroll forms to the House Office of Finance approving the increases in the salaries of Stultz, Matlock, and Dukes with the knowledge,[34] undeniable after the first remittitur, that the increment would be used to pay his personal and official expenses. These payments benefited not the employees but the defendant himself. Obviously the defendant directly benefited from the payments to his personal creditors and to the creditors of his business, the House of Diggs. It is equally clear that the defendant profited from the payment of his congressional expenses. Payment of these bills enabled the defendant to provide services to his constituents and thus furthered his prospects for reelection.[35]

Defendant argues nevertheless that using clerk-hire funds to compensate employees for paying district office expenses fell within his discretion to determine both the salaries and responsibilities of his employees, provided those responsibilities relate to the Congressman's "official and representative duties." [36] The phrase "official and representative duties," so the argument goes, is sufficiently broad to encompass an employee's responsibility for paying congressional expenses.[37] We disagree.

*The defendant's argument erroneously equates a congressman's discretion to define the duties of an employee with the unfettered power to divert monies intended for one purpose to another, completely unauthorized purpose.* During the period relevant to the indictment, the Committee on House Administration had fixed an allowance for district office expenses at $500 per quarter or $2,000 per annum.[38] Thus the allowance for clerk-hire and the allowance for district office expenses were separate and distinct.[39] No House regulation or order authorized the commingling of these funds, either directly, or, as in this case,

---

**33.** Legislative Branch Appropriation Act, 1978, Pub.L.No.95–94, 91 Stat. 653, 667 (1977); Legislative Branch Appropriation Act, 1977, Pub.L. No.94–440, 90 Stat. 1439, 1447 (1976); Legislative Branch Appropriation Act, 1976, Pub.L.No. 94–59, 89 Stat. 269, 280 (1976); Legislative Branch Appropriation Act, 1975, Pub.L.No.93–371, 88 Stat. 424, 432 (1974); Legislative Branch Appropriation Act, 1974, Pub.L.No.93–145, 87 Stat. 527, 535 (1973). *See* 2 U.S.C. § 57(a)(1) (1976) (Committee on House Administration may fix the amount of the allowance for clerk hire).

**34.** The defendant's actual intent will be discussed *infra.*

**35.** While it could be argued that the constituents of his District also profited from the arrangement, the point is that the employees who by law were the intended recipients of the money reaped no benefit.

**36.** *See, e. g.,* 2 U.S.C. § 92 (1976) (establishing maximum number of employees on clerk hire; granting discretion to Member to set salaries, within fixed minimum and maximum amount, and to remove employees from the rolls at any time with or without cause).

**37.** "Official and representative duties" was not defined in the legislative history to the Appropriations Acts, or the applicable House regulations.

**38.** *See, e. g.,* House Administration Comm. Order No. 8 (effective 1 Oct. 1973); House Administration Comm. Order No. 15 (effective 18 Dec. 1974). Defendant makes no argument that he did not receive this money. In addition, members of Congress were reimbursed from separate allowances for their travel, the travel of their staff, and expenses for office telephones and office equipment. *See* 2 U.S.C. § 57(a)(1) (1976); Record (3 Oct. 1978) at 73–74 (testimony of John Lawler, Chief of the Office of Finance).

**39.** That the district office allowance may have been inadequate to meet office expenses, *see* Brief for Appellant at 24, has no legal significance.

indirectly.[40] Had Congress intended that the clerk-hire funds be used to pay expenses of the district office it could have so provided.[41]

After the events relevant to the defendant's conviction had already taken place, the House Administration Committee published Committee Order No. 30 (Transfer Among Allowance), effective 3 January 1977.[42] Committee Order No. 30 permits the transfer of up to $15,000 from the clerk-hire allowance to two other funds, from which allocation then may be made to cover other expenditures, including "Official Expenses Outside the District of Columbia." *The order has no retroactive effect.*[43]

Adoption of the order to permit the transfers here at issue thus strongly suggests that this practice was *not permitted prior* to the effective date of the order. Even if the order were retroactive, it would not justify the defendant's conduct in this instance. A congressman may transfer funds from the clerk-hire allowance to the allowance for official expenses *provided he certifies to the House Office of Finance of his election to do so.*[44] *Diggs certified the opposite.* If the new order had been in effect, Diggs made false statements even by that standard.

In defense, Diggs cites the testimony of the Chief of the House Office of Finance,

---

**40.** We note that the dissent's assertion that the inquiry of the so-called Obey Commission into the "perceptions and understanding of members of the House of Representatives about the allowance system," Record (4 Oct. 1978) at 37, revealed "significant ambiguity" among congressmen concerning the proper use of the clerk-hire allowance needs a bit of clarification. *See* Dissenting opinion at —— U.S.App.D.C. at ——, 613 F.2d at 1007–1008. On cross-examination, Mr. Victor Fischer, Director of Survey Research for the Commission, admitted that the actual survey administered to the members of Congress included no questions concerning the congressmen's use of the clerk-hire funds for the defrayal of their congressional or personal expenses. *See* Record (4 Oct. 1978) at 55–56. Mr. Fischer's perception that congressmen other than Representative Diggs inflated the salaries of their employees to pay congressional expenses thus derived solely from discussions with members of his Commission, *see id.* at 56–58. No congressman was ever asked directly whether this was indeed the practice that he followed because of the apparent "sensitivity of the issue." *See id.* at 58 (testimony of Victor Fischer).

**41.** The legal standard is the law and rules Congress has passed, not the conduct some may have engaged in. "[F]acing up to reality," in our colleague's phrase, may tell us that congressmen other than Diggs convinced themselves that there was an "ambiguity" associated with the clerk-hire rules, but the "reality" of other offenders does not change the law; for this court the law is plain.

Our colleague would be on more comfortable (albeit *mistaken*) ground as a matter of legal reasoning if he were to conclude that using clerk-hire funds for *either* the defrayal of the defendant's congressional *or* personal expenses was not clearly improper. He argues in essence that the regulations governing the clerk-hire funds were vague, that there was considerable doubt concerning the propriety of using these funds for the defrayal of congressional expenses, and that therefore the judge's instruction on good faith was clearly erroneous. If the regulations were as vague as the dissent contends, then, as a matter of *logic* how can anyone say for sure that the use of the clerk-hire funds to defray Diggs' *personal* expenses was clearly improper? How can our colleague draw a principled distinction between the propriety of drawing on clerk-hire funds to meet Diggs' personal expenses and the propriety of drawing on those same funds to meet Diggs' congressional expenses when the dissent supposedly is unclear as to exactly what the regulations did and did not permit?

He offers no explanation other than the implicit one that he was influenced by the politics involved (*e. g.,* what he terms "facing up to reality"). This fatal flaw in the dissent's logic underscores the fact that *the only sensible and principled interpretation that can be given to the standard governing clerk-hire funds is one which recognizes that these funds were intended for the sole use and personal benefit of the employee.* This clear standard was violated when Congressman Diggs indirectly used the clerk-hire funds to pay either his congressional or his personal expenses.

**42.** *See* Supplemental Certified Index to Record (filed 31 Aug. 1979).

**43.** Despite language in the dissenting opinion which may be taken to suggest the contrary, Judge Leventhal does not appear to disagree with our interpretation that House Order No. 30 has no retroactive effect.

**44.** *See* Staff of Comm. on House Administration, 96th Cong., Regulations and Accounting Procedures for Allowances and Expenses of Committees, Members and Employees 136 (Comm. Print 1979).

Mr. John Lawler, for the notion that the clerk-hire funds could be applied to district office expenses. When questioned by the prosecutor regarding the purpose of the clerk-hire allowance, Mr. Lawler testified:

It's used to pay compensation of employees in the performance of official duties.[45]

When pressed further on whether the allowance "include[d] any expenses which were incidental to the employment," Mr. Lawler responded:

The regulations in that time period didn't have any specific definition as far as official duties. It's silent on the question of what it might include.[46]

Rather than providing support for the defendant's position, Mr. Lawler's rather cautious testimony can be taken to do no more than state the obvious: it was within a congressman's discretion to define the parameters of an employee's responsibilities so long as those responsibilities related to the congressman's "official and representative duties." Lawler's testimony cannot be interpreted to mean that a congressman also had the discretion, under the guise of compensating his employees, to appropriate clerk-hire funds for purposes other than those intended by the appropriation and duly certified by the congressman.

### 2. Mail Fraud

■ With these conclusions in mind, we turn now to the law applicable to the mail fraud and false statements statutes.[47] The basic elements of the offense of mail fraud under 18 U.S.C. § 1341 are "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."[48] Because only "a scheme to defraud" and not actual fraud is required, proof of fraudulent intent is critical.[49]

In this case, the testimony concerning the defendant's intent was conflicting. Briefly recalling the evidence, the key witness for the Government, Jean G. Stultz, testified that the defendant increased her salary and the salaries of Felix Matlock and Ofield Dukes for the purpose of using the inflated portions to pay the defendant's expenses. Mrs. Stultz also asseverated that the payments she made "were always . . . at the direction of Congressman Diggs."[50] The defendant's testimony essentially was that Jean Stultz *voluntarily* paid his bills to ease his financial situation. Far from being voluntary, Stultz testified that she "felt that it was almost—you might almost say a condition of employment."[51]

Stultz also claimed that the defendant directed her to instruct Matlock and Dukes on which district office expenses to pay from their inflated salaries. Matlock and Dukes both corroborated the fact that Stultz directed them to make these payments, and Matlock further asserted that he received his instructions from the defendant personally after Mrs. Stultz resigned in August 1976. He added that he went along with the scheme only because he "didn't want to make any waves."[52] *While the defendant admitted that Dukes and Matlock paid* certain congressional expenses, *he disclaimed any intention of inflating their salaries for this purpose. This was the is-*

---

**45.** Record (3 Oct. 1978) at 66.

**46.** *Id.*

**47.** The mail fraud counts regarding salary inflation related only to transactions and mailings involving Felix Matlock's paychecks; the false statement counts to transactions involving the salaries of Dukes, Stultz, and Matlock.

**48.** *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362 (1954). *See Weiss v. United States,* 122 F.2d 675 (5th Cir. 1941): "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." *Id.* at 681, *quoted in United States*

*v. Reid,* 175 U.S.App.D.C. 120, 129, 533 F.2d 1255, 1264 (D.C. Cir. 1976).

**49.** *See, e. g., United States v. Brown,* 540 F.2d 364, 374 (8th Cir. 1976); *United States v. Reid,* 175 U.S.App.D.C. 120, 533 F.2d 1255, 1264 (D.C. Cir. 1976); *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180–81 (2d Cir. 1970).

**50.** Record (28 Sept. 1978) at 106.

**51.** Record (29 Sept. 1978) at 42.

**52.** Record (30 Sept. 1978) at 17.

*sue the defendant's own testimony made in regard to his intent.*

It was entirely within the province of the jury to resolve the conflicting testimony. The jury concluded that the defendant personally devised and directed a scheme to divert portions of the three employees' salaries to meet his personal and official expenses. We hold that there was ample evidence to support this conclusion.

Second, we find that the actual scheme to defraud has clearly been established. No House regulation or order authorized the use of the clerk-hire allowance for purposes other than the sole use and benefit of the staff of a congressman; the money was to go to individual employees for their personal salaries and subsequent personal use or it was not to be expended at all. Defendant submitted payroll authorization forms to the House Office of Finance approving the increases in his employees' salaries while concealing the fact that these monies would be diverted to the Congressman's own benefit. His conduct amounted to no less than a scheme to take illicit kickbacks from his employees in the form of payments of his personal or congressional expenses.

The courts have held that kickback schemes involving the use of the mails run afoul of the mail fraud statute:

[T]he mail fraud statute is violated when some or all of the following factors are present: a duty to disclose an interest with a concomitant failure to do so; *an attempt to cover-up through false pretenses; a taking of money or property or rights of another through the use of kickbacks,* extortion, bribery, tax evasion, perjury, or violation of some state or federal statute; a use of the United States mails.[53]

The defendant defrauded the public of not only substantial sums of money but of his faithful and honest services.[54]

The final element under the mail fraud statute is a use of the United States mails "'for the purpose of executing the scheme.'"[55] One must "cause" the mails to be used to satisfy this requirement. In *Pereira v. United States* the Court held that a defendant "causes" the use of the mails where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."[56] In addition, although the schemer need not "contemplate the use of the mails as an essential element,"[57] the mailings must be "sufficiently closely related to [the] scheme to bring his conduct within the statute."[58]

Applying these principles to the case at bar, we hold that the mailings were reasonably foreseeable and were sufficiently closely related to the defendant's scheme to bring his conduct within the coverage of 18 U.S.C. § 1341. The paychecks were mailed to Felix Matlock from Washington, D.C., to Detroit, Michigan. It was "reasonably foreseeable" that Matlock would receive these checks via the United States mails by

---

53. *United States v. Bush,* 522 F.2d 641, 646 (7th Cir. 1975) (emphasis added), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). *See, e. g., United States v. Rabbitt,* 583 F.2d 1014 (8th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Brown,* 540 F.2d 364, 374–75 (8th Cir. 1976); *United States v. Barrett,* 505 F.2d 1091 (7th Cir. 1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). *But see United States v. McNeive,* 536 F.2d 1245 (8th Cir. 1976).

54. *See, e. g., United States v. Brown,* 540 F.2d 364, 374 (8th Cir. 1976) ("a public official may be prosecuted under 18 U.S.C. § 1341 if he devises a scheme whereby bribes or kickbacks are accepted in the course of conduct of his office, since such conduct operates to defraud the citizens of his government of their right to his honest and faithful services").

55. *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) (quoting *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944)).

56. 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (citing *United States v. Kenofskey,* 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917)).

57. *Id.* at 8, 74 S.Ct. at 362.

58. *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) (footnote omitted).

virtue of the simple fact that Matlock lived and worked in Detroit. That the checks somehow could have been delivered otherwise than through the mails is immaterial.[59] Moreover, a sufficiently close nexus existed between the fraudulent scheme and the mailings of the checks. The checks contained the actual proceeds of the fraud and thus constituted the "lifeblood of the scheme" from the defendant's viewpoint.[60] Manifestly, these mailings were in furtherance of the scheme to defraud.

### 3. *False Statements*

■ Having concluded that the defendant violated the mail fraud statute, we address the question of whether the defendant was also guilty of transgressing 18 U.S.C. § 1001. The courts have interpreted section 1001 to require that the false representations made to the "department or agency" be material.[61] The test of materiality is whether the statement "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination."[62] Proof of actual reliance on the statement is not

required; the Government need only make a reasonable showing of its potential effects.[63]

In this case, the defendant was accused of falsifying the payroll authorization forms submitted to the House of Representatives Office of Finance for his employees Stultz, Matlock, and Dukes.[64] In seeking the payroll increases for these employees, Congressman Diggs failed to disclose to the Office of Finance the *real purpose* for which the monies were intended—the defrayal of his personal and congressional expenses. Had the defendant revealed these intentions, it reasonably could be expected that the Office of Finance would not have honored the payroll requests or at least would have referred the matter to the appropriate House committee for advice.[65] We hold, therefore, that the defendant's omissions were material.[66]

### 4. *Jury Instructions*

The defendant assigns as error part of an instruction that the trial judge gave to the

**59.** *See, e. g., United States v. Talbott,* 590 F.2d 192, 195 (6th Cir. 1978). Congressional employees could receive paychecks in only one of three ways: by personal delivery to the employee via inside mail, by deposit in one of five local banks, or by the United States mail. *See* Record (27 Sept. 1978) at 25–27, 106–07 (testimony of John Lawler); Brief for Appellee at 44.

**60.** *United States v. Reid,* 175 U.S.App.D.C. 120, 533 F.2d 1255, 1264–65 (D.C. Cir. 1976).

**61.** *See, e. g., United States v. Talkington,* 589 F.2d 415, 417 (9th Cir. 1978); *United States v. Krause,* 507 F.2d 113, 118 (5th Cir. 1975); *Weinstock v. United States,* 97 U.S.App.D.C. 365, 231 F.2d 699, 701 (D.C. Cir. 1956); *Freidus v. United States,* 96 U.S.App.D.C. 133, 223 F.2d 598, 601 (D.C. Cir. 1955).

**62.** *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C. Cir. 1956).

**63.** *See United States v. Talkington,* 589 F.2d 415, 417 (9th Cir. 1978); *United States v. Beer,* 518 F.2d 168, 172 (5th Cir. 1975).

**64.** The Office of Finance clearly is a "department or agency" within the meaning of the statute. *See United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955).

**65.** The House Committee on Standards of Official Conduct is empowered to "give consideration to the request of any Member, officer, or employee of the House for an advisory opinion with respect to the general propriety of any current or proposed conduct." Rules of the House of Representatives, H.R.Doc.No.416, 93d Cong., 2d Sess. § 698 (1975) (rule X(e)(1)(D)). This Committee issued an advisory opinion on 11 July 1973, which stated that "it [was] improper to levy, as a condition of employment, any responsibility on any clerk to incur personal expenditures for the primary benefit of the Member or of the Member's congressional office operations." Advisory Op. No. 2, Comm. on Standards of Official Conduct of the House of Representatives, Appendix for Appellant at 177, 178. *See* notes 68–69 *infra* and accompanying text. This strengthens the argument that the Office of Finance would not have honored the payroll requests; at least without some further investigation.

**66.** *See also Bramblett v. United States,* 97 U.S. App.D.C. 330, 231 F.2d 489 (D.C. Cir.), *cert. denied,* 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956); *Romney v. United States,* 83 U.S. App.D.C. 150, 167 F.2d 521 (D.C. Cir.), *cert. denied,* 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771 (1948).

jury for both the mail fraud and false statement offenses on the question of the defendant's intent:

> The question is whether the defendant at the time he approved the payroll authorizations representing that certain employees would be paid specific salaries intended that those employees would actually receive and have the complete use of those salaries, or did he intend that a portion of the salary would be remitted by the employee for the payment of his obligations. What I have said respecting good faith as a defense in a mail fraud charge is also applicable to false official statement charges.[67]

The defendant claims that the instruction deprived him of his good faith defense and erroneously directed the jury, as a matter of law, that diverting employees' salaries for payment of congressional expenses was unlawful. The defendant's contentions are without merit.

■ The charge to the jury must be considered in two parts. The first aspect of the charge concerns the defendant's intent at the time he approved the adjustments in the salaries of his employees. *This part does no more than pose the question of good faith exactly as the defendant himself had presented the issue at trial.* The defendant denied ever having increased the salaries of his employees with the intention of using the excess to pay his bills; the testimony of

his employees was uniformly to the contrary. The defendant claimed they volunteered the money; the employees said payment to Diggs of part of their inflated salaries was virtually a condition of employment. The employees also pointed to the remarkable rise in their salaries when they began payments to or for Diggs, and the immediate drastic reduction when each ceased being a part of the scheme. The trial judge properly called upon the jury to resolve this issue. Viewing the disputed portion of the instruction in connection with the whole charge, we find that the instruction correctly informed the jury on the question of the defendant's good faith.

■ The second aspect of the instruction involves the propriety of combining under the term "obligations" not only the payments of the defendant's personal and business expenses but the payments of his congressional expenses as well. We need not reiterate the reasons for our conclusion that *diverting employees' salaries* to meet either the defendant's personal or official expenses was unlawful. The judge merely combined under one heading *two kinds of illegal payments;* he was not required to deal with each separately in the instruction. We hold that no error may be attributed to the instruction.

### 5. House Committee Advisory Opinion

■ Defendant also claims that the Government predicated its theory of prose-

---

67. Record (6 Oct. 1978) at 19. The entire instruction on the issue of good faith provides:

> Now, ladies and gentlemen, an important concept of law in any case where specific intent is a requisite element is the concept of good faith. I wish to say this to you about good faith.
>
> Good faith constitutes a complete defense to one charge[d] with the defense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who acts on the basis of any opinion honestly held by him or a belief honestly entertained by him is not chargeable with fraudulent intent, even though such opinion is erroneous, such belief is a mistaken belief. Evidence which establishes only that a person has made a mistake in judgment or an error in management or was careless does not establish fraudulent intent.

> In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another.
>
> Good faith is a defense to an offense such as mail fraud, one of the elements of which is fraudulent intent.
>
> The question is whether the defendant at the time he approved the payroll authorizations representing that certain employees would be paid specific salaries intended that those employees would actually receive and have the complete use of those salaries, or did he intend that a portion of the salary would be remitted by the employee for the payment of his obligations. What I have said respecting good faith as a defense in a mail fraud charge is also applicable to false official statement charges.
>
> *Id.* at 18–19.

cution of the alleged violations on an advisory opinion of the House of Representatives, thus unconstitutionally casting this court into the role of interpreting the internal rules of the House.[68] The advisory opinion, issued by the Committee on Standards of Official Conduct of the House of Representatives, suggests that "it is improper to levy, as a condition of employment, any responsibility on any clerk to incur personal expenditures for the primary benefit of the Member or of the Member's congressional office operations." [69]

The defendant confuses the purpose for which the advisory opinion was introduced in evidence and thus misconceives our role. The opinion was admitted as evidence relevant to the defendant's intent, and not as a legal standard to which the defendant's conduct was required to conform. The defendant testified that he believed an employee properly could "make available . . . funds from [his] salary" to pay his expenses.[70] The opinion had some bearing on the defendant's belief or intent. It was permissible to introduce it into evidence to rebut the defendant's testimony.

The defendant clearly was tried not for violating the internal rules of the House of Representatives but for violating the mail fraud and false statements statutes. As the Supreme Court held in United States v. Brewster,[71] a member of Congress may be prosecuted under a criminal statute provided the government's case does not intrude into legislative processes or functions. No such improper probing is alleged in this case. Article I, § 5 does not immunize a member of Congress from the operations of the criminal laws.[72] As the Supreme Court has stated:

No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.[73]

### B. The Scheme to Defraud: Salaries for Noncongressional Employees

Having concluded that the defendant engaged in a scheme to defraud the government by inflating the salaries of Matlóck, Dukes, and Stultz, it remains to be considered whether the defendant also schemed to defraud the government, in violation of 18 U.S.C. §§ 1001 and 1341, by placing on the House of Representatives' payroll Jeralee Richmond and George Johnson. Summarizing the evidence, the defendant acknowledged that George Johnson, a certified public accountant, provided

---

**68.** "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." U.S.Const. art. I, § 5.

**69.** Advisory Op. No. 2, Comm. on Standards of Official Conduct of the House of Representatives (issued 11 July 1973), Appendix for Appellant at 177, 178. Other relevant portions of the document provide:

The opinion clearly would prohibit any Member from retaining any person on his clerk-hire allowance under either an express or tacit agreement that the salary to be paid him is in lieu of any present or future indebtedness of the Member, any portion of which may be allocable to goods, products, printing costs, campaign obligations, or any other non-representational service.

Id. Advisory Opinion No. 2 was intended merely "to provide some guidelines and assistance" to members of Congress concerning the proper use of the clerk-hire allowances.

**70.** Record (4 Oct. 1978) at 99, 100.

**71.** 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

**72.** See id. at 518, 92 S.Ct. 2531; United States v. Isaacs, 493 F.2d 1124 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

**73.** United States v. Lee, 106 U.S. 196, 220, 1 S.Ct. 240, 261, 27 L.Ed. 171 (1882).

personal services while on the House rolls from July 1973 to December 1974 but claimed that Johnson also acted as an adviser to him "with respect to black economic, development projects." [74] Johnson testified, in contrast, that the defendant and the House of Diggs were indebted to him, and that once the defendant placed Johnson on the congressional payroll he told Johnson to "go ahead and adjust these checks [Johnson's paychecks] against the bills." [75] Johnson also asserted that he "didn't at least do any . . . financial or accounting work for Congress." [76] He quit the congressional payroll in December 1974 because he "just couldn't rationalize receiving those checks." [77]

Jeralee Richmond, employed at the House of Diggs' Funeral Home, allocated approximately eighty percent of her time to bookkeeping work and only twenty percent to handling constituents' problems. From July 1974 to August 1976, however, she received her entire compensation from the congressional clerk-hire allowance.

### 1. False Statements

The defendant argues that Richmond and Johnson properly were compensated from the clerk-hire allowance because they both had official responsibilities. It was a matter of his discretion to fix their duties and salaries as congressional employees,[78] and the fact that these employees concededly rendered personal services as well, he claims, did not affect the exercise of that discretion. His failure to reveal the exact nature of the employees' responsibilities on the payroll forms submitted to the House Office of Finance is thus contended to be immaterial.

We find the defendant's argument without merit. This case presents a situation analogous to that confronted in *Bramblett v. United States.*[79] In that case, a former United States Congressman devised a scheme to convert to his own use monies allotted for the payment of congressional employees. The defendant was convicted of violating 18 U.S.C. § 1001 by falsely and fraudulently representing to the disbursing office of the House of Representatives that a named individual was entitled to compensation as his official clerk, when that individual in fact did no congressional work.[80]

We see no significant difference between *Bramblett* in which the employee performed no congressionally related work while on the congressional payroll and this case in which only a nominal percentage of Richmond's and Johnson's responsibilities were congressionally related. The difference is merely one of degree and not of substance. There was sufficient evidence from which the jury could conclude that the defendant in fact placed Richmond and Johnson on the payroll with the intention of compensating them for services rendered to the House of Diggs or the defendant. The defendant's representations to the House Office of Finance that Johnson and Richmond were *bona fide* congressional employees therefore were fraudulent and material, in violation of 18 U.S.C. § 1001.

### 2. Mail Fraud

■ We also are of the opinion that the mail fraud violations were proven. First, there is sufficient evidence from which to infer the defendant's fraudulent intent as the perpetrator of the scheme to defraud:

**74.** Record (4 Oct. 1978) at 85.

**75.** Record (30 Sept. 1978) at 175. Johnson reduced the House of Diggs' bills by the amount, approximately, that he received as clerk-hire compensation.

**76.** *Id.* at 172.

**77.** *Id.* at 173.

**78.** *See* notes 36–37 *supra* and accompanying text.

**79.** 97 U.S.App.D.C. 330, 231 F.2d 489 (D.C. Cir.), *cert. denied,* 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956).

**80.** The Court held in *Bramblett v. United States,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), that the disbursing office was a "department or agency" of the United States within the meaning of 18 U.S.C. § 1001.

to reiterate, the jury reasonably could have concluded from all the evidence that the defendant placed Johnson and Richmond on the payroll in order to compensate them for services rendered to himself and his business. Second, the requirement of a use of the mails was also satisfied. The paychecks were mailed to Richmond and Johnson in Detroit, Michigan, from Washington, D.C. That the United States mails would be used to deliver these paychecks clearly was foreseeable.[81] The mailings were also sufficiently related to the scheme to satisfy the requirement that they be "for the purpose of executing the scheme."[82] The paychecks contained the actual proceeds of the fraudulent scheme.[83] Their delivery thus was in furtherance of the scheme to defraud.

### C. Selective Prosecution

Finally, the defendant claims as error the trial court's failure to grant the defendant's motion for discovery and an evidentiary hearing on his allegation of selective prosecution.[84] We find that the defendant's claim has no merit.

■ The conscious exercise of some selectivity in prosecuting individuals for similar conduct is permissible.[85] To establish a *prima facie* case of discriminatory or selective prosecution, a defendant must show that "'the selection [is] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'"[86]

■ That burden has not been met in this case.[87] As a preliminary matter, we note that the defendant has not demonstrated to our satisfaction that he was singled out for prosecution. The defendant sought discovery of the Government's reasons not to prosecute three other congressmen who allegedly had engaged in conduct similar to that forming the basis of the charges against the defendant.[88] One of the three, Congressman James Hastings, however, in fact was prosecuted and convicted for taking kickbacks from employees to pay his personal bills.[89]

Even assuming that the defendant's evidence of selective enforcement somehow was sufficient, he has not shown that the decision to prosecute was based on an unjustifiable standard. All that the defendant could point to in support of his claim was the general danger that the selective prosecution of congressmen for actions relating to their official responsibilities could "'become a weapon used to discipline politi-

---

81. See notes 55–56, 59 *supra* and accompanying text.

82. *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974).

83. *See United States v. Reid,* 175 U.S.App.D.C. 120, 533 F.2d 1255, 1264–65 (D.C. Cir. 1976); notes 54–58, 60 *supra* and accompanying text.

84. The defendant filed a motion prior to trial requesting discovery and an evidentiary hearing pursuant to rule 12(b)(1) of the Federal Rules of Criminal Procedure.

85. *See, e. g., Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *United States v. Bell,* 165 U.S.App.D.C. 146, 506 F.2d 207, 222 (D.C. Cir. 1974); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974).

86. *United States v. Bell,* 165 U.S.App.D.C. 146, 161, 506 F.2d 207, 222 (D.C. Cir. 1974) (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)).

87. Because of our conclusion that the defendant has no colorable claim of discriminatory prosecution, we do not pass on the question of whether the showing a defendant must make to obtain discovery related to that claim differs from the showing that a defendant must make at trial to establish a *prima facie* case of selective prosecution. *Compare, e. g., United States v. Cammisano,* 413 F.Supp. 886, 890–91 (W.D. Mo.), *vacated on other grounds,* 546 F.2d 238 (8th Cir. 1976), *with United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974).

88. Congressmen Wayne Hays and John Young were not prosecuted for allegedly maintaining on their congressional payrolls individuals who provided no services related to the discharge of their official responsibilities.

89. *See United States v. Hastings,* No. 76–606 (D.D.C. 17 Dec. 1976). Congressman Hastings did not appeal his conviction. Also, the government obtained a civil judgment against Hastings for his manipulations of the clerk-hire allowance. *See United States v. Hastings,* No. 77–0511 (D.D.C. 25 Jan. 1978).

cal foe[s].'"[90] While a concern for the integrity of the legislative process prompts careful inquiry into a congressman's claim of discriminatory prosecution,[91] there must be at least *some* substance to that contention. Defendant made no colorable showing whatsoever that he was prosecuted for improper political purposes.[92]

### III. CONCLUSION

In conclusion, we hold that the case was proved and the conviction is

*Affirmed.*

OBERDORFER, District Judge (concurring):

I agree with Judge Wilkey's analysis and conclusions.

Comparison of the specific forms, defendant executed to authorize the "salary adjustments" (e. g., App. 89) with the specific vouchers signed by him to authorize payments for "official office expenses incurred in my Congressional District" (e. g., App. 101) makes the case, so far as I am concerned. I am particularly influenced by the certificate on the voucher for district office expenses: "I further certify that payment therefor has not been received." I think those documents establish that defendant, a fiduciary, knowingly authorized disbursement of funds from the U.S. Treasury for his personal and district office use on the false representation that he was drawing the funds to pay additional salary to his employees and that the disbursing authority repeatedly acted in reliance on those representations to the detriment of the United States and to the advantage of defendant.

It may (or may not) be that if the forms executed by defendant had disclosed that a portion of the "salary adjustment" would be spent by the employee for defendant's district office expense, the disbursing authority would have approved. But, the forms, as executed, did not disclose and, in fact, concealed information necessary to put the disbursing authority on notice of any issue to be decided, such as the amount to be diverted from "salary adjustment" to something else.

With great respect for the dissent, I am not persuaded that we can or should reverse or remand.

LEVENTHAL, Circuit Judge (dissenting in part):

I dissent from the disposition ordered by the court. Congressman Diggs was indicted for having devised a scheme to defraud the United States and to obtain money by false pretenses and fraudulent representations by inflating the salaries of congressional employees in order to receive salary kickbacks. There was convincing evidence that he did receive kickbacks which were then applied to his personal debts and the business expenses of his Detroit funeral home (the House of Diggs). If the case had been tried on that basis alone, there would have been no problem on appeal.

But there is a problem, one traceable to the government's theory in this prosecution. The government alleged that there were also kickbacks which appellant used to defray his *congressional* office expenses. For purposes of the charged offenses, these uses were to stand on an equal footing as those involving his personal uses. Thirteen of the twenty-nine counts of the indictment relate to kickbacks which in whole or in part reimbursed employees for congressional office

---

**90.** Memorandum in Support of Motion to Dismiss at 7 (quoting *United States v. Berrios,* 501 F.2d 1207, 1209 (2d Cir. 1974)), Appendix for Appellant at 24.

**91.** *See United States v. Brewster,* 408 U.S. 501, 555–58, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) (White, J., dissenting).

**92.** The most that the defendant could muster as support was the broad assertion that "[b]y virtue of his role as a Member of Congress, Diggs

frequently comes into conflict with the then-incumbent administration." Memorandum in Support of Motion to Dismiss at 7, Appendix for Appellant at 24. The only example given of that conflict was "the stinging dissent" filed by United States Attorney Earl J. Silbert to a report prepared by the House District Committee, which the defendant chaired, on the D.C. Criminal Code. *Id.* at 7 n. 4, Appendix for Appellant at 24.

expenses.[1] In the six counts pertaining to the inflated salary of Felix R. Matlock, one of appellant's congressional employees, appellant is said to have used the overpayments, with one trivial exception, for the expenses of the congressional office in his district. It is the government's theory, in two of those counts, that appellant violated the false official statements act, 18 U.S.C. § 1001, when he submitted payroll authorization forms to the House Finance Office which represented that the full amount of money set forth as salary for Matlock was compensation for service as a House employee, when in fact appellant had inflated that salary to "pay his expenses."

The trial judge shared the government's theory and also merged these two quite different situations. In the process the court virtually obliterated appellant's good faith defense as to salary increases expended for official purposes. Appellant sought a good faith instruction that if appellant acted with a good faith belief in his right to compensate his employees for paying official congressional expenses, he should be acquitted of the pertinent counts. The court declined to give such an instruction unless it included a statement to the effect that the Congressman could not have acted in good faith unless he believed that the salary described in the employee's payroll authorization forms would be solely for the personal use of the employee, and not compensation for a personal *or* congressional expense. Defendant declined the giving of the instruction with such an addendum. The trial judge then instructed the jury:

> Good faith is a defense to an offense such as mail fraud, one of the elements of which is fraudulent intent. The question is whether the defendant at the time he approved the payroll authorizations representing that certain employees would be paid specific salaries intended that those employees would actually receive and have the complete use of those salaries, or did he intend that a portion of the

salary would be remitted by the employee for the payment of his [the Congressman's] obligations.

The court thereby precluded the taking of any distinction between personal and official expenses in the consideration of appellant's good faith defense. Thus, although appellant had freely admitted during the trial that he had used some of the salary increases to reimburse employees for official expenses,[2] a position consistent with his good faith defense as to the propriety of such practices, the jury was directed to treat alike his good faith intent as to the use of salary funds for his personal obligations and for his congressional office expenses.

This is a court that is instructed by Congress to discharge its appellate functions with due regard for the interest of justice, 28 U.S.C. § 2106. Justice is a victim when courts proceed on the basis of form, without due regard to realities. The majority today joins the trial judge and the prosecution in stressing form over reality.

Turning first to form, it is plain that, as the majority concluded, no statute, rule, regulation, or order expressly authorizes the practice in which appellant was engaged. By the same token the applicable law is not explicit in defining the permissible use of clerk-hire funds. The statutory provisions concerning clerk-hire allowance have been little changed since first enacted in 1893. Their language states merely that clerk-hire funds are: "[f]or staff employed by each Member in the discharge of his *official and representative duties* " (emphasis added).[3] The majority concedes in note 37 that "official and representative duties" was not defined in the legislative history to the appropriations acts, or in the applicable House regulations. The regulations of the House Administration Committee state only that:

> No person shall be paid from any clerk-hire allowance if such person does not perform the services for which he re-

---

1. Counts 1–4 and 12–20.

2. Record (Oct. 4, 1978) at 118.

3. *See, e. g.*, Legislative Branch Appropriation Act, 1978, Pub. L. No. 95–94, 91 Stat. 653, 667 (1977).

ceives such compensation in the offices of the Member in Washington, D.C., or in the State or the district which such Member represents.[4]

The question is whether the "duties" and "services" of a staff member may include incurring *official* expenses in order to assist the Congressman in the discharge of his congressional functions.

In facing up to reality, we must confront the underlying question, whether it was widely understood on Capitol Hill that there was an ambiguity in the rules governing use of clerk-hire funds which permitted Congressmen to use the mechanism of inflated allowances to cover congressional expenses. While such use was not explicitly authorized at the time, if it was in some vogue, however uneasy, we must seriously question whether the broad fraud-false statement laws are fairly applicable to reach a practice that is not specifically covered by House rules. There is a fundamental difference between breach of ethics and criminal violations. What is shenanigans, bad taste, and borderline is not the same as what is criminal.

One of the main witnesses for the government at appellant's trial was John Lawler, Chief of the House Finance Office. The government sought to identify the materiality of appellant's statements (materiality being a key element of the false statements offense), and in that endeavor repeatedly inquired into the nature of the clerk-hire allowance restrictions. Appellant argues that Mr. Lawler's testimony demonstrates the uncertain nature of the use of clerk-hire funds for official purposes. The majority, however, concludes that Mr. Lawler's testimony gives no support to appellant's contention. In my view, the jury would have been well within its province in concluding, under an appropriate instruction as to the law, that Mr. Lawler's testimony overall gave support to appellant on

this issue. It is not without significance that the government's witness gave testimony that was carefully circumscribed. Mr. Lawler's testimony ran as follows:

Q. What is the Clerk-hire allowance?

A. The Clerk-hire allowance is a description of a set of funds that each member of Congress has available to pay his employees in the discharge of their official duties.[5]

A few minutes later the government returned to the same subject matter:

Q. Mr. Lawler, let me repeat the question: Regarding the salary amounts listed on the Payroll Authorization Form what allowable purpose would that be for the amount listed on the Payroll Authorization Form?

A. It was payment for compensation to employees for their performance of official duties.[6]

Later in the questioning:

Q. I will repeat the question. During the period 1973 through 1976, based on the regulations of the Committee on Administration in the House of Representatives, for what purpose could the Clerk-hire allowance be used?

A. The regulations stated that it was for the disbursement to employees for the performances of official duties.[7]

Note how studiously Mr. Lawler merely reiterated the wording of the appropriations legislation and the regulations of the House Administration Committee, and carefully sidestepped the issue of the definition of the "official duties" of a Congressional employee. And now turn to the significant later testimony, when Mr. Lawler was called by the government as a rebuttal witness:

Q. The clerk hire allowance, would you again repeat exactly what the clerk hire allowance is for?

---

4. Committee on House Administration, Regulations on Allowances and Expenses for Committees, Members, and Employees of the U.S. House of Representatives, 94th Cong. (May 1976) at 20.

5. Record (Sept. 27, 1978) at 12.

6. *Id.* at 29–30.

7. *Id.* at 113–14.

A. It's used to pay compensation of employees in the performance of official duties.

Q. My question was the compensation for the performance of official duties, did that include any expenses which were incidental to the employment?

A. The regulations in that time period didn't have any specific definition as far as official duties. It's silent on the question of what it might include.[8]

Do not let a hasty reading blur the significance of this last answer. On direct, the government asked Mr. Lawler three times, and three times he answered "performance of official duties." The government avoided probing what that phrase meant as applied to this issue of expenses, the issue of this case. Then the government did put the question to Mr. Lawler on rebuttal, and asked whether clerk-hire funds could be used for official expenses. He did not say "No"—as the majority would categorically declare. Instead, he said only that the regulations are *silent* as to such use.

For its opinion that use of clerk-hire finds for official expenses was patently illegal, the majority finds support—astutely phrased as a strong suggestion—in Committee Order No. 30 (Transfer Among Allowance), published by the House Administration Committee effective January 3, 1977. Order No. 30 is described by the majority as permitting the transfer of up to $15,000 from the clerk-hire allowance to two other funds, from which allocation then may be made to cover other expenditures, including official expenses incurred outside the District of Columbia. The majority glances at Order No. 30 and says, simply: "The order has no retroactive effect." It reasons that promulgation with retroactive application

"strongly suggests" that the practice it now sanctions was not permitted prior to the effective date of the order.

If realism is added to the analysis, another explanation emerges. What is equally plausible, I submit more plausible, is the House Administration Committee's awareness that some members were using clerk-hire allowance for congressional expenses, because the particularized expense allowance was patently inadequate, and were finding a predicate for this use of clerk-hire funds in the ambiguity of "official duties" of clerks. What Order No. 30 does is to acknowledge the justification for what had been an uncertain practice, coupled with an attempt to cope with the problem of abuse by putting a limitation as to amount. Of course the limitation on amount could not be retroactive, and the bounds on the practice set by Order No. 30 are prospective.

This view is fortified when Order No. 30 is viewed within the entire context of prior practice. As the majority notes, during the period relevant to the indictment, funds for district office expenses came from a meager fixed allowance of $500 per quarter. If it was as obvious as the majority says that clerk-hire funds simply could not be used for district office expenses, since there was a separate and distinct appropriation for that purpose, it is strange that Order No. 30 sought to remedy the funding deficiency by providing for the indirect use of clerk-hire funds for those costs rather than by directly increasing the district office allotment. It seems likely that Congress was indirectly acknowledging the not uncommon past practice.[9]

To provide a note of realism, the appellant called Victor Fischer, who was em-

---

8. Record (Oct. 3, 1978) at 66.

9. Advisory Opinion No. 2 of the House Committee on Standards of Official Conduct similarly cannot be read as a congressional standard prohibiting appellant from using clerk-hire allowances for official purposes. Not only does it lack the status of an official House rule, more significantly the opinion is ambiguous as to the propriety of using clerk-hire funds to reimburse an employee for voluntarily assuming obligations related to congressional expenses. To be sure, Opinion No. 2, which was introduced into evidence and read to the jury, is arguably relevant to the issue of appellant's intent, but this fact only reinforces my feeling that the jury should have been permitted to determine on its own whether appellant acted in good faith with respect to salary increases for official—as opposed to personal—obligations.

ployed by Congress during 1977 as Director of Survey Research for the so-called Obey Commission. That study commission, the Commission of Administrative Reviews of the House of Representatives, investigated various elements of financial ethics among Congressmen. Outside the hearing of the jury, Mr. Fischer testified to responses of congressmen concerning inadequacy of the allowance system. He stated that in the course of administering his survey, the senior staff of the Commission became aware of a number of practices related to allowances, including the increasing of clerk-hire salaries to compensate employees for paying expenses related to the congressman's discharge of his official and representational duties.[10] The Commission concluded that the allowance system was not adequate to cover official expenses. The trial court disposed of this testimony by agreeing with the government that Order No. 30 was not retroactive, and that it would confuse the issues to make this testimony available to the jury because if other congressmen committed violations of the law this did not excuse appellant.[11] Apart from the fact that this position was something of a turnabout for the government, which had in its bill of particulars emphasized that it was identifying that appellant's activities were contrary to the "common understanding" of congressmen, it did not grapple with the point that the inquiry of the Obey Commission, and the emergence of Order No. 30, revealed that previously there was at least significant ambiguity as to what the law provided. The importance of ambiguity to a good faith defense is plain enough. But the judge put blinders on the jury as to practice, and then reined them in with his instruction.

**10.** Record (Oct. 4, 1978) at 39–40.

**11.** *Id.* at 45.

**12.** *See generally* H.R. Rep. No. 96–351, 96th Cong., 1st Sess. (1979).

**13.** *Id.* at 1.

**14.** *See id.* at 28–37.

**15.** Paragraphs 1 and 8, Rule XLIII, Rules of the House of Representatives. Paragraph 1 of the

The vitality of a distinction between use of clerk-hire funds for personal and congressional obligations is strongly confirmed by the way in which the House of Representatives handled the internal disciplinary actions against Congressman Diggs.[12] This is not strictly part of the record, but is in the public domain. The Diggs matter was referred to the House Committee on Standards of Official Conduct. That committee received from its Special Counsel a summary of the evidence against the congressman and unanimously adopted a Statement of Alleged Violations containing 18 counts relevant to his alleged misconduct. The Committee's charges against Diggs involved "essentially the same conduct which led to Representative Diggs' indictment and conviction."[13] Yet the Committee without exception kept entirely separate counts for using salary increases for personal expenses from counts concerning such use for "congressional expenses."[14]

Upon receipt of a letter from Diggs in which he admitted to having *personally* benefitted from the use of clerk-hire allowances for his *personal* expenses, the Committee withdrew the 18 counts and generally found the congressman to have violated two broad House rules[15] with respect to his misuse of funds for *personal* purposes. Its recommendation of formal censure was ultimately adopted by the full House. The Committee did not pursue the charges that Diggs violated those House rules by using funds for *congressional* expenses. In its final report the Committee on Standards of Official Conduct did not contest this practice, but stated simply that in connection with inflation of staff salaries for "office

Rule XLIII (the Code of Official Conduct) provides:

A Member, officer, or employee of the House of Representatives shall conduct himself at all times in a manner which shall reflect creditably on the House of Representatives.
Paragraph 8 states:
A Member of the House of Representatives shall retain no one from his clerk hire allowance who does not perform duties commensurate with the compensation he receives.

related expenses, Representative Diggs maintains that his use of clerk-hire funds for such purposes was not in violation of any House rules." [16] I do not place great emphasis on this development, in part because it is not in the record and must be considered if at all on the basis of judicial notice, and in part because it materialized after the trial and various explanations may be considered. Nevertheless, at the very least it indicates that the idea of a different treatment for congressional expenses did not seem unrealistic to the congressmen, the persons most likely to be familiar with the nuances of the problem.

In light of what was at best a showing of uncertainty as to what the law provided, plus evidence that others may have understood use of clerk-hire funds for office expenses to have been permitted, the jury should have been allowed to separately consider whether or not appellant acted with fraudulent intent in using the clerk-hire funds for congressional expenses. The trial court's instruction should have permitted the jury to consider the defense that appellant acted in good faith when he certified the payment of compensation to clerks notwithstanding the understanding that they would be using the funds for office expenses.

I do not say the jury was required to find, or would have found, that appellant in fact acted in good faith with respect to inflated salaries which were used for his office expenses. But appellant was entitled to put this defense four square.

The issue before us is not whether we would draw a distinction between personal and office expenses if we were filing the forms, but whether appellant was entitled to put to the jury a good faith defense on the basis of distinction he claims to have perceived. I would vacate the conviction on the thirteen counts identified above,[17] remand for retrial if the government be so advised, and in any event would remand as to the other counts for resentencing uncontaminated by the convictions I believe should be vacated.

**16.** H.R. Rep. No. 96–351, 96th Cong., 1st Sess. (1979) at 19.